SAMUEL L. TILLINGHAST, Receiver, v. SAMUEL A. CHAMPLIN & others.

The receiver of a dissolved copartnership, appointed by a decretal order in equity, is an officer of the court appointing him, invested with the whole equitable title to the partnership property without an assignment, and in any suit concerning such property, represents the interests in such property of all parties to the suit in which he was appointed, if not of all persons not parties to such suit.

Such receiver may, to enable him to perform his trust, suo motu, and without special leave from the court appointing him, bring suits to possess himself of the partnership property, incurring no risk except as to costs; the property, when in his hands, being in custodia legis, and subject to administration by order of the court.

The administrator of a deceased copartner, upon whose bill a receiver of the copartnership property has been appointed, thereby surrenders to the receiver all his dominion over the copartnership property, at least so far as the purposes of the suit are concerned; and in any proceeding in equity thereafter instituted by the receiver, with regard to such property, to enable him to perform his trust, he represents not only the interests and equities of the creditors of the copartnership in the property, but also those of the deceased copartner. Hence, to a bill instituted by such receiver to possess himself of the partnership property and have the same applied to the payment of the partnership debts, neither the representative of the deceased copartner nor the creditors of the firm are necessary parties.

The rule that the creditors of a firm have no equitable lien upon the copartnership property, but can only work out such a lien through the equities of the copartners, applicable whilst the copartners are administering their own funds, has no application to the case of a copartnership dissolved by the death of one of the copartners, especially if the surviving partner be insolvent, or where, though living, one or both the copartners have become insolvent or bankrupt, so that their property is in the hands of assignees for distribution. In such cases an equitable lien attaches, in favor of the copartnership creditors upon the joint property, and in favor of the separate creditors of each copartner, upon his separate property, in the hands of the surviving partner, as a trustee for each class of creditors by implication, or in the hands of the assignees, as trustees, by virtue of an express trust, which will be administered in equity against such trustees, upon the direct application of the creditors.

Where the bill places the relief which it asks upon the ground of actual fraud or covin in the respondent, and the proof fails to support it upon that ground, the bill must be dismissed with costs, although upon the facts as proved, the court might have relieved upon some other ground than fraud, had the bill placed the relief upon such other ground.

The reasons for this rule considered and discussed, and the cases of Mount Vernon Bank v. Stone, 2 R. I. Rep. 129, and of Masterson v. Finnegan, ib. 316, criticized, and reconciled under it.

The rule applies only when actual or moral, as distinguished from constructive fraud, is charged, and does apply when such fraud is substantially charged as the ground of relief, whether the word "fraudulent" be used or not.

A bill, filed by a receiver of a partnership in behalf of a numerous body of creditors dismissed under the above rule, will be dismissed without prejudice; and where drawn under the advice of counsel, without fault on the part of the receiver, the costs will be allowed to him out of any funds which have come or may come to his hands as such receiver.

15 *

Real estate, purchased with the copartnership funds, or by the copartnership credit, for the uses of the firm, will be treated in equity as copartnership property as between the copartners, and be held applicable to the payment of copartnership debts; and from such purchase and use will be presumed to be intended by the copartners to be held and treated by them as copartnership property, notwithstanding the deed is taken to them as tenants in common, and without describing them as copartners.

When, however, the deed is so taken, according to the weight of authority in this country, such property will, after the payment of the copartnership debts and the adjustment of the balances between the copartners, be regarded in equity as the joint undivided real property of the copartners, according to their several interests in the firm, and, as such, pass to their heirs instead of to their personal representatives.

A *bonâ fide* purchaser or mortgagee for value of the real property of a partnership, the legal title to which is vested in the copartners, or in some one of them for the firm, without notice of the equitable rights of others in it as a part of the copartnership funds, will, upon the ground of his own equities as such purchaser, be protected in his title in equity as well as at law.

And such purchaser from a surviving partner of the whole, or even of an undivided portion, of such property, and obtaining from such partner a conveyance of the legal title thereto, would not take it subject to the same trust as in the hands of his grantor merely because he knew it to be copartnership property and that there were copartnership debts still outstanding; if the purchase were made by him openly, and with the apparent consent of all concerned, and under circumstances fairly indicating to him that no breach of trust, by the application of the purchase-money to his individual uses, was intended by the vendor, but that the property was sold by him in the execution of his trust for the payment of the copartnership debts.

But where a purchase of the undivided half of a planing-mill, &c., was made for value of a surviving partner of a firm of housewrights, by one who knew that the mill was built up with the copartnership funds and credit for, and had always been applied solely to, the copartnership uses,—that the dissolved firm was greatly indebted, if not insolvent, and that none of its debts had been paid by the surviving partner,—and the conveyance was taken and the purchase-money paid secretly, and on the very night on which the vendor absconded with it, the purchaser was held to be affected by the circumstances with constructive notice of the breach of trust intended, at the time of the purchase, to be committed by the absconding partner, and to hold the legal title thus acquired by him subject to the trust of his vendor; although the proof was not sufficient against his answer, to convict him of an actual participation in the corrupt design of his vendor, and he swore in his answer, that from the fact that the copartners held the estate by their deed as tenants in common merely, he supposed that the undivided half of it which he purchased, was the individual property of his grantor.

BILL IN EQUITY. The bill in this case was filed by the complainant, as receiver of the late firm of Gardner & Brother, housewrights, formerly doing business in East Greenwich; he having been appointed thereto by a decretal order of one of the associate justices of the supreme court, made on the 9th day of August, 1855, on a bill filed for the administration of the partnership effects, and to compel the application of the same to the payment of the partnership debts, by George C. Kenyon, administrator of William A. Gardner, the deceased partner, against Benjamin W. Gardner, the surviving partner.

The bill, after setting forth the parties, the appointment of the complainant as receiver, and his authority in that character to take possession of all the effects and property of the copartnership, states, that amongst the other property of the firm was a certain planing, saw, and grist mill, with the fixtures and machinery thereof, the proceeds of which, when sold, ought to be applied to the payment of the copartnership debts ; but that the same is in the possession of the respondent, Samuel A. Champlin, who holds out the complainant from the same, claiming the same, or some interest in the same, by virtue of a certain deed executed by Benjamin W. Gardner, the surviving partner, to him, and purporting to convey one undivided half of the property in question to Champlin, by the following description, to-wit : " One undivided half part of a certain lot of land situated in said East Greenwich, in the village, and bounded northerly by King street, easterly by a street two rods wide, southerly by a lot of land formerly conveyed by the town of East Greenwich to school district No. 1, in East Greenwich, and westerly by a street two rods wide ; it being the same lot of land which was sold by said town to William A. Gardner and Benjamin W. Gardner, by deed dated December 19, 1851 ; also, one undivided half of all the buildings, except a blacksmith's shop, which are thereon standing, together with one undivided half of all the machinery, grist-mill, tools, belts, fixtures, and materials, and other personal property in and upon said premises ; also the personal property on the premises belonging to me." The bill further charges that " the pretended consideration " of the deed was $1,250, and that " *said pretended sale was made by the said defendants with the design and intent that said Gardner (the surviving partner) should appropriate said sum to his own use, and carry the same away with him, as hereinafter mentioned, and said deed was executed at ten o'clock at night, and the said Gardner left the state immediately afterwards.*"

The bill then goes on to state the formation of the firm of Gardner & Brother some time prior to the 19th day of December, 1851,—the purchase from the town of East Greenwich, for the firm's use, on that day, for the consideration of $410, of the lot on which the planing works, &c., were afterwards built, and

the conveyance by the town of East Greenwich of the lot so purchased to William A. Gardner and Benjamin W. Gardner, their heirs and assigns,—the payment of the consideration-money out of the copartnership funds,—the erection of the planing-mill, &c., thereon, and placing of the machinery, &c., therein, by the firm, for the firm uses,—the use of the property by the firm up to the death of William A. Gardner,—and the taking of sole possession upon that event by Benjamin W. Gardner as surviving partner, of that and all other the copartnership property; that Benjamin W. carried on business after William A.'s death with this property,—finishing and completing the contracts of the copartnership with the same, collecting in the dues of the copartnership, paying none of its debts, but contracting further debts as surviving partner; and further charges " *that imme- diately after executing the said pretended conveyance to the said Champlin, on the 8th day of June,* 1855, *the said Benjamin W. Gardner abandoned the concerns of said copartnership, absconded from said East Greenwich, conveyed or accompanied by said Champlin out of town, carrying with him a large amount of money, including said* $1,250, *the pretended consideration of the said conveyance, and all the proceeds of the effects of said copart- nership,*" &c. ; and alleges the insolvency of Benjamin W. at the time of his absconding, and that the firm was insolvent, or nearly so, at the death of William A., there being then, and still, a large amount of debts outstanding against the firm.

The bill further alleges that the real and personal estate of the copartnership were holden by the firm for the payment of its debts,—that the copartnership creditors had a lien or equity thereon through the copartners for payment of the copartner- ship debts during the life of William A.,—that the lien con- tinued after his death, and that the joint property and effects, and all subsequent acquisitions by Benjamin W., as surviving partner, were held by him for the same purpose, and were clothed with a trust for the payment of the copartnership debts,— that Benjamin W. was bound in equity and good conscience, with all practicable diligence, faithfully to administer the assets of the firm, to wind up and settle its concerns, and pay its debts,—that he had no right or power to sell and convey the

property and effects to Champlin, or any other person for any other purpose,—and that the property and effects so *pretendedly* conveyed by Benjamin W. Gardner to the respondent, Champlin, are, in the hands of the latter, chargeable with the same trusts for the payment of the copartnership debts as in the hands of Gardner, and ought to be sold for that purpose, and the proceeds, or the sum of $1,250 mentioned in the said deed as the consideration thereof, ought to be applied and paid by Champlin to the payment of said debts. It charges Champlin with full notice, at the time of his pretended purchase, of the trusts under which Gardner, as surviving partner held the property sold to him, *of the fact that he did not intend to apply the proceeds of the pretended sale to their payment but to his own use and to abscond with the same,*—of the existence of the copartnership during the life of William A., and of its being carried on after his death by Benjamin W., as surviving partner,—of the fact that the property pretendedly conveyed to him by Benjamin, was copartnership property,—and that the copartnership owed a large amount of debts at the time of William A.'s death, and continued to do so down to and at the time of the conveyance by Benjamin to him.

The bill further alleges that the *pretended* deed made by Benjamin W. Gardner to Champlin, who had full notice of the existence of the debts "*is a fraudulent conveyance as against said copartnership creditors, and as such ought to be set aside accordingly;*" and the stating part of the bill winds up with the allegation, made by amendment before a copy of the bill had been taken out by the respondent, Champlin,—"*that the said Benjamin W. Gardner, before he left East Greenwich, in June last, left with the said Samuel A. Champlin a power of attorney, empowering said Champlin to defend all suits, and to attend to other matters for him.*"

The second, third, and fourth interrogatories of the bill were pointed to discover from Champlin his knowledge of Benjamin W. Gardner's intent to abscond with the purchase-money, and leave the copartnership debts unpaid, and to his alleged assistance in getting him off; and an additional interrogatory was filed, upon an amendment of the bill stating the power of attor-

ney left by Gardner with Champlin, for the purpose of discovering the existence of such a power and compelling the production of the same.

The bill prayed that the deed of June 8, 1855, might be decreed to be null and void, and be surrendered up to be cancelled,—that the property and effects purporting to be conveyed thereby might be wholly exonerated and discharged therefrom, and be sold, and the proceeds thereof, or that the sum of $1,250 might be paid by the defendants, and applied to the payment of the copartnership debts,—that Champlin might be restrained from selling or conveying, or otherwise disposing of any and all the real and personal estate mentioned in the bill, and for general relief.

No service of the subpœna was effected on the absconding partner, Benjamin W. Gardner, but the purchaser, Samuel A. Champlin, having been served, appeared and answered.

In his answer, Champlin admitted the demand of the receiver of the possession of the planing, saw, and grist-mill, with the fixtures, machinery, and personal property mentioned in the bill, and of his refusal to deliver possession of the same to him, and set up his claim to one undivided half thereof, by virtue of the deed made to him thereof by Benjamin W. Gardner, as mentioned in the bill, on the 8th day of June, 1855. He denied that the Gardners entered into copartnership on or before the 19th of December, 1851; but admitted that the copartnership existed some time in 1852, and continued, as to the housewright business, until the 18th of February, 1855, when William A. Gardner died. The answer averred ignorance on the part of the respondent, even as to information and belief, whether upon the death of William A., Benjamin W. Gardner took, or was in possession of, all the property, estate, and effects of the copartnership, or whether Benjamin undertook to finish all the contracts of the firm, but admitted, that Benjamin was in possession of part of the property, effects, and estate of the firm, and that as surviving partner, he did undertake to finish, and did, in fact, finish a certain contract or contracts for the making of merchandise boxes, and that he completed such contract or contracts on or before the first day of May, 1855. The answer also denied

all knowledge whether Benjamin W., as surviving partner, contracted any debts, or what debts of the copartnership, if any, were paid by him, but admitted, that soon after making the deed of the 8th of June, 1855, and on the next day, as the respondent has been informed and believes, the said Benjamin W. abandoned the concerns of the copartnership and absconded from East Greenwich.

The answer further denied that the lot of land mentioned in the bill was purchased by the Gardners as copartners with copartnership funds; but avers, on the contrary, from information and belief, that the same was bought by William A. Gardner, and paid for by him, and that Benjamin paid him for one undivided half of the same, and that the conveyance was taken to them as tenants in common, and that the buildings were built by them thereon, and the fixtures and machinery placed therein, and the whole held, by them in that character, and not as copartners, until the death of William A. The answer denied all knowledge, information, and belief of how much, if any, of the proceeds of the copartnership effects Benjamin took with him when he absconded, but denied that he took all such proceeds; averring, from information and belief, that when he absconded he was insolvent himself, and left the copartnership insolvent, and that the estate of William A. Gardner is sufficient for the payment of all the just debts of the copartnership. The answer further averred that the respondent negotiated for and made the purchase of the property and estate conveyed to him on the 8th of June, 1855, and took the conveyance, and paid the consideration thereof fairly, without any intent or design to defraud or to assist Benjamin W. Gardner to defraud the creditors of the copartnership or any of them, or of the said Benjamin W., and without knowing, or having been informed, or suspecting, that he was about to abscond, or that he had any design or intent to defraud or delay the creditors of the copartnership or his own creditors; and insisted that Benjamin had good right and full power to sell and convey the undivided half of the property and estate described in his deed, and that the respondent had good right and full power to take the conveyance, and that by said conveyance the respondent had acquired

a perfect title to said undivided half, whether Benjamin held the same as tenant in common or as surviving partner.

The answer admitted that at the time of the execution of the deed, the respondent knew that the copartnership had existed in the lifetime of William A. Gardner, and that William A. was dead, and, from information and belief, that after the death of William A., Benjamin, as surviving partner, had finished certain contracts to make boxes, as copartner, but not that said Benjamin carried on business to any further extent or in any other manner,—that the respondent also knew that said copartnership did owe debts at the time of the death of William, and continued to do so until the execution of the deed of the 8th of June, 1855; but the answer affirmed, that the respondent was entirely ignorant of the amount due from said copartnership at any time, and denied that at the time of the execution of said deed he knew, or had been informed or believed, that the copartnership was insolvent. The answer further denied that the respondent knew that Benjamin did not intend to apply the $1,250 paid to him, to the liquidation of the partnership debts, or that he knew that Benjamin intended to carry off the same, or that he had any information or intimation from any person, or any belief or suspicion that he intended so to do. It further denied all knowledge or suspicion, information or belief, at that time, that Benjamin was about to abscond, or that the respondent conveyed or assisted in the conveyance of Benjamin from East Greenwich; but averred, that the first information, intimation, knowledge, or suspicion, that the respondent had of the absconding of Benjamin, or of his intention to abscond, was on the 12th day of June, at about 9 o'clock in the forenoon, in West Greenwich, where he casually heard that he had gone.

The answer further denied that the deed was executed as late as 10 o'clock at night, but averred that the respondent, having on the 8th day of June prepared for the payment of the money, called upon Benjamin to receive from him the deed agreeably to contract, and to pay the consideration for the same, about 7 o'clock in the afternoon, at which time the deed had not been acknowledged; and that to obtain a justice of the peace, and to

enable Benjamin to count the money, detained the defendant until about 9 o'clock in the evening, when he obtained the deed, and that the defendant has been informed and believes, that Benjamin left East Greenwich the same night or the next morning, but that the respondent never knew, and has never been informed, nor has he any means of ascertaining, how much money Benjamin carried off with him, or whether he carried off any with him.

The answer further denied that the respondent received the conveyance or made the purchase with notice of the trusts mentioned in the plaintiff's bill, and repeated the denial of any knowledge or notice that Benjamin did not intend to apply the proceeds of sale to the payment of the copartnership debts, but to his own use, or that he intended to abscond or to defraud in any manner the creditors of the copartnership, or to convert to his own use, or to withhold from said creditors, any property or effects justly belonging to them.

The answer to the amended bill also denied that Benjamin, previous to his leaving East Greenwich, gave to the respondent, or to him and Robert H. Champlin, a power of attorney, empowering him, or him and the said Robert H., to defend all suits, and attend to other matters for him, the said Benjamin; and averred that Benjamin never gave such power, or power to attend to other matters, or to do any act, matter, or thing for him, the said Benjamin W. Gardner.

To this answer a general replication was filed. A commission to take testimony for either party was then issued; and from the proofs taken under it it appeared, that William A. Gardner and Benjamin W. Gardner entered into copartnership as housewrights some time in the autumn of the year 1851; that in December of that year the respondent, Samuel A. Champlin, who was a brother-in-law of William A. Gardner, bid off for him, at public auction, for the price of $410, the lot of land upon which the planing works were afterwards erected; but that when the deed came to be executed, William A. Gardner requested that it might be made to him and his brother Benjamin, and it was made to them as tenants in common, on the 19th day of December, 1851, William A. Gardner paying the consid-

eration money; that it was bought by the Gardners for the avowed purpose of building thereon a planing-mill, &c., to enable them more conveniently and profitably to carry on their joint business of housewrights, &c.; that the mill, &c. was commenced and completed in the spring of 1852; that the building materials for the mill, &c. were purchased on the credit of Gardner & Brother, and were paid for by that firm, and the work done upon it was charged to them, by their directions, as a firm, and so far as paid for, was paid for by them in that character; and that the property thus created was always treated as company property, and used by the Gardners in the business of their copartnership until the death of William A. Gardner, in February, 1855; that at that time the firm was largely indebted, but that the firm property, including the mill, &c., seemed to have been considered by the representative of the estate of the deceased copartner and by the surviving partner as belonging in undivided half shares between them, and that on the 29th day of May, 1855, the respondent, Champlin, became the purchaser of an undivided half of the machinery in the mill, and other personal property of the firm in and about the premises at a public sale of the interest of William A. Gardner in the same, made by his administrator, under an arrangement between the administrator and Benjamin W. Gardner that the purchaser at the sale should have his undivided half part of the same, so called, at the same rate; and that thus he became the purchaser of the machinery, &c. from the administrator of the deceased copartner and the surviving copartner, paying about the sum of $316 therefor to each; that the respondent, being a man of some means, collected together and borrowed money enough afterwards to buy the undivided half the real estate, planing-mill, &c. of Benjamin, and about 9 o'clock of the 8th of June, 1855, came with him to the house of a justice of the peace to procure his acknowledgment of the deed of that date conveying the interest of Benjamin in the mill estate to Champlin, and that Champlin, in the presence of the magistrate who counted over the money, paid to Benjamin W. Gardner the consideration named in the deed, to wit, the sum of $1,250, and received the deed in question from him; that the business was not concluded until near 10 o'clock, when they went away, after which

Benjamin W. Gardner was not seen in East Greenwich, absconding that night or early the next morning. Further than this, no evidence was offered tending to prove the allegations of the bill that Champlin, the purchaser, knew of the intent of Benjamin W. Gardner to abscond with the purchase-money, or to defraud the creditors of the firm out of the same, or that he conveyed, or assisted to convey him out of town.

It appeared, however, that the firm was largely indebted, if not insolvent, at the death of William A. Gardner; that Champlin, the respondent, knew, from information, of this indebtedness to the amount of $3,000, though at one time, from information given by the administrator of William A., he might have thought that the private estate of William A. Gardner, together with the property of the firm, would be sufficient to pay the debts of the copartnership; that none of these debts had been paid by Benjamin W., unless it might be to the amount of $25; that the estate of William A. Gardner has been represented insolvent, and that, taking into the account the debts of the copartnership which have been proved against it, there will be a large deficiency of assets to meet all the claims upon it.

The case was argued at East Greenwich, at the September term, 1856, by *Cozzens* for the complainant, and by *Blake* for the respondent, Champlin, and at the suggestion of the court, after having been taken into consideration, was, upon the matters of law raised by it, reargued at the September term of the court at Providence, to which, by agreement, the further action of the court upon the cause had been postponed; the decree to be entered in the clerk's office at East Greenwich, as of the September term of the court for the county of Kent.

*Cozzens*, for the complainant, argued, that where real estate, as in this case, was bought for and solely applied to copartnership uses, and the building and works upon it built upon copartnership credit, and paid for, so far as they were paid for, out of copartnership funds, that although the deed was taken in the names of the copartners as tenants in common, a court of equity regarded it, for all purposes of application to the payment of copartnership·debts, as personal property of the firm, notwithstanding the conveyance of the legal title must obey the forms

prescribed by law for the conveyance of real estate. He contended that the creditors of the firm, as he thought, in modern times, themselves, directly, and at all events, through the equities of the copartners, had an equitable lien upon such property for the payment of their debts, which a court of equity, except in the single case of a *bonâ fide* purchaser without notice that the property was copartnership property and especially without notice that there were copartnership debts, would follow into whosoever hands it might be, and whoever might be vested with the legal title, subject it to the payment of such debts; that the court acted, in such cases, upon the idea that *one* copartner, whether the other were living, or, as in this case, dead, had no power to apply such property to other than copartnership uses— that is, where firm debts existed, to the payment of such debts ; and that, so far as purchasers with notice as above were concerned, they had possessed themselves of a trust fund, as the court viewed it, which they were bound to see applied to the uses of the trust. In the case at bar, he contended that the purchaser, Champlin, the brother-in-law of the deceased copartner, and the intimate of the absconding one, had full knowledge that the property was copartnership property, bought by the firm and applied to copartnership uses, and that at the time of his purchase, there were, outstanding, a large amount of firm debts,—and indeed that the firm was insolvent. He adverted, too, to the purchase by the respondent of an undivided half, first of the personal property of the firm, and then of this undivided half of the planing-mill estate as indicative of his knowledge, notwithstanding the denial of the answer, that the surviving partner from whom he derived his title to both, was dealing with the firm property as if it were his separate estate, and as sufficient of itself to fix him with the trust of applying it to the payment of the firm debts. He cited, to the various points he made, Story on Partn. §§ 92, 93, 94, 97 ; 3 Kent's Com. 38, 39, and n. *c*, 63 ; Collyer on Partn. §§ 133, 135 ; 1 Story Eq. Jurisp. §§ 674, 675 ; 2 ibid. §§ 1207, 1207 *a ; Hoxie* v. *Carr*, 1 Sumn. 174 ; *Dyer* v. *Clark*, 5 Metc. 562, 580 ; *Sigourney* v. *Mann*, 7 Conn. 11 ; *Goodman* v. *Washburn*, 17 Pick. 519, 537 ; *Hewitt* v. *Sturdevant*, 4 B. Monroe, 459, 489 ; *Bank of Port Gibson* v.

*Baugh*, 9 Sm. & Marsh. 209 ; 11 N. H. 404 ; *Shepherd* v. *Mc-Evers*, 4 Johns. Ch. R. 136 ; *Butchart* v. *Dresser*, 31 Eng. L. & Eq. R. 121 ; *Dale* v. *Hamilton*, 5 Hare, 369, 382 ; Hill on Trustees, 233, n.; *Anderson* v. *Tompkins*, 1 Brock. 456 ; *Edgar* v. *Donnelly*, 2 Munf. 387 ; *Ford* v. *Heron*, 4 Munf. 316 ; *McDermot* v. *Lawrence*, 7 Serg. & Rawle, 438 ; *Buchan* v. *Sumner*, 2 Barb. Ch. R. 202, 204 ; *Frink* v. *Branch*, 16 Conn. 261, 271 ; *Bach* v. *Winn*, 11 B. Monroe, 320 ; *Kramer* v. *Arthurs*, 7 Barr. 165 ; *Kelly* v. *Greenleaf*, 3 Story, 93 ; *Wilder* v. *Chapman*, 4 Edw. Ch. R. 669 ; *Rogers* v. *Batcheller*, 12 Peters, 221 ; *Piatt* v. *Oliver*, 3 McLean, 27 ; *Covington* v. *Forest*, 17 Miss. 131 ; *Allen* v. *Central Valley Co.* 21 Conn. 430 ; *Barnside* v. *Merrick*, 4 Metc. 537 ; *Peck* v. *Fisher*, 7 Cush. 386 ; *Halsted* v. *Shepherd*, 23 Ala. 558 ; *Andrews* v. *Brown*, 21 Ala. 437 ; *Lang's Heirs* v. *Waring*, 25 Ala. 625 ; *Lawrence* v. *Taylor*, 5 Hill, 111 ; *Delmonico* v. *Guillaume*, 2 Sand. Ch. R. 360 ; *Jarvis* v. *Brooks*, 7 Foster, 37 ; *Brown* v. *Brown*, 3 Myln. & Keene, 443 ; *Houghton* v. *Houghton*, 11 Sim. 491 ; *Phillips* v. *Phillips*, 1 Mylne & Keene, 649 ; *Fereday* v. *Wightwick*, 1 Russ. & Mylne 45 ; *Townsend* v. *Devaynes*, 11 Sim. 498, n.; 1 Am. Lead. Cas. 504, 505 ; 1 White & Tudor's Lead. Cas. in Equity, 69, 71, 72 ; 1 Parsons Merc. Law, ch. 11, § 4, p. 172.

On the point that the bill charged fraud, he contended that it was proved; and if not, that it was a bill in a double aspect, similar in its frame to the bill in *Hoxie* v. *Carr*, and cited *Masterson* v. *Finnigan*, 2 R. I. Rep. 316, 319.

*Blake* for respondent, Champlin, contended—

*First.* That the real estate in question did not belong to the firm, because not proved to have been purchased with copartnership funds,—the presumption from the fact that the title was taken to the individuals who composed the firm, as tenants in common, being that it was not to be held by them as copartnership property ; and he noticed that in this case there was not, from the form of the deed to the Gardners, as in *Hoxie* v. *Carr*, nor from any clause in the articles of copartnership, as in some of the cases cited on the part of the complainant, nor any proof from any source, to rebut the presumption, from the fact that the deed was to the Gardners as tenants in common ; that it

16 *

was designed, for such he argued was the test, to be converted
by them into copartnership property, so that a court of equity
could act upon it as such.   Upon this point he cited, *Smith* v.
*Smith*, 5 Ves. 189; *Morris* v. *Barrett*, 3 Younge & Jervis, 384;
*Thornton* v. *Dixon*, 3 Bro. Ch. Cas. 199; *Balmain* v. *Shore*, 9
Ves. 501; *Cookson* v. *Cookson*, 5 Simons, 529; S. C. Eng. 11
Cond. Ch. R. 558; *Phillips* v. *Phillips*, 1 Mylne & Keene, 209;
S. C. 7 Eng. Cond. Ch. R. 208; *Bell* v. *Phyn*, 7 Ves. 453; *Ran-
dall* v. *Randall*, 7 Sim. 271; S. C. 10 Eng. Cond. Ch. R. 52;
*Goodman* v. *Richardson*, 11 Mass. 469; *Smith* v. *Jackson*, 2 Edw.
Ch. R. 28; *McDermot* v. *Lawrence*, 7 Serg. & Rawle, 438; *Hale*
v. *Henrie*, 2 Watts, 143; *Ridgway's appeal*, 3 Harris, (15 Penn.)
175.   He noticed, too, that the deeds in each of the cases of
*Dyer* v. *Clark*, 5 Metc. 562; *Howard* v. *Priest et al.* ibid. 582;
and *Hoxie* v. *Carr*, 1 Sumn. 174, 180, described the grantees as
partners, and that in each of those cases it was clearly proved
that the property was purchased out of the funds of the firm, as
well as applied to its uses, and that in each a clear intent was
proved that the property purchased should be held as copartner-
ship property.   He made the same comment with regard to the
case of *Sigourney* v. *Mann*, 7 Conn. 11, and placed it by the side
of *Frink* v. *Branch*, 16 Conn. 260, decided in 1844, to show the
ground upon which it was decided.

   *Second.* He argued, that the creditors of the firm had no lien
themselves on the copartnership property and could enforce none
in equity, but could come in only under the equities of the co-
parners, criticizing an expression in 1 Hare & Wal. Am. Lead.
Cases, 491, which seemed to imply more, and comparing the
expression with the cases cited by those annotators; *Green* v.
*Green*, 1 Hammond, 535; *Sumner* v. *Thompson*, 8 ibid. 328;
*Heirs of Pugh* v. *Currie*, 5 Ala. 446; *Dyer* v. *Clark*, 5 Metc. 562;
*Howard* v. *Priest et al.* ibid. 582; *Smith* v. *Jackson*, 2 Edw. Ch.
R. 28; and concluding, that no such idea could be drawn from
any of them, and the contrary from the express language of
some of them.   He cited also, to this portion of his point, *Buchan*
v. *Sumner*, 2 Barb. Ch. R. 206; Story on Partn. §§ 97, 360, 361;
*Ex parte Ruffin*, 6 Ves. 119, 126; *Ex parte Williams*, 11 Ves. 5;
*Hunt* v. *Waterman*, 2 R. I. Rep. 298; *Smith* v. *Edwards et al.* 7

Humph. (Tenn.) R. 106 ; *Kimball* v. *Thompson*, 13 Metc. 283 ; *Reese* v. *Bradford*, 13 Ala. 846 ; *Wilson* v. *Soper*, 13 B. Monr. 411 ; *Rice* v. *Barnard et al.* 20 Vermont, 471. He argued also that the receiver, Tillinghast, represented only the creditors of the firm, and not the equities of the deceased partner, and cited as in point, *Glen* v. *Gill*, Receiver, 2 Magruder, R. 1.

*Third.* Distinguishing the rights of a *surviving* partner as exceeding, in this respect, the rights of a partner during the existence of the firm, or after its dissolution, whilst all the partners were living, he contended, that if the real estate in question was copartnership property, the surviving partner could convey a good title to a purchaser of his undivided half, although the purchaser knew that it was copartnership property, unless indeed, the purchaser knew, of which he argued there was no proof in this case, that the vendor intended to convert to his own use or to misapply the proceeds of sale. To this point he cited, Story on Partn. §§ 101, 351, &c. ; Story on Agency, § 37 ; Wm. Story on Contracts, § 362 ; 3 Kent's Com. 36, 44, 63, 5th ed. ; *Anderson* v. *Tompkins*, 1 Brock. 456, per Marshall, C. J. ; *Wilson* v. *Williams*, 14 Wend. 146 ; *Bell* v. *Morrison*, 1 Peters, 351 ; 2 Barb. Sup. Ct. R. 629 ; *Egberts* v. *Wood*, 3 Paige, 526 ; *Slipper et al.* v. *Slidstone*, 5 T. R. 493 ; *Craig* v. *Henderson*, 2 Barr. 261 ; 7 Watts, 465 ; 6 Cowen, 441 ; 7 Conn. 11, 324 ; *Dyer* v. *Clark*, 5 Metc. 562 ; *Case* v. *Abeel*, 1 Paige, 393, 399 ;• 1 Hare & Wall. Am. Lead. Cas. 492 ; *Andrews* v. *Brown*, 21 Ala. 437 ; *McAlister* v. *Montgomery*, 3 Hayw. 94 ; *Howard* v. *Priest et al.* 5 Metc. 585 ; *Delmonico* v. *Guillaume et al.* 2 Sand. Ch. R. 366. He further contended, that a purchaser from a partner, upon general principles, the debts being unscheduled, and therefore unknown to him, was not bound to see to the application of the purchase-money, even admitting the trust, and his knowledge that he was purchasing the copartnership or trust property ; he cited Hill on Trustees, 503, &c. ; White & Tudor's Lead. Cas. 46, &c. 73 ; 2 Story Eq. Jurisp. § 1135. He commented on *Howard* v. *Priest et al.* 5 Metc. 582, *Sigourney* v. *Mann*, 7 Conn. 11, *McDermot* v. *Lawrence*, 7 Serg. & Rawle, 438, *Hale* v. *Henrie*, 2 Watts, 143, to show, that they expressly discountenanced any such motion, and that they, as well as the

case of *Hoxie* v. *Carr*, 1 Sumn. 174, were cases in which the facts gave to the purchaser notice of a design on the part of the selling partner to misapply the proceeds.

AMES, C. J. This bill is brought by the plaintiff, as receiver of the late firm of Gardner & Brother, of East Greenwich, housewrights. He was appointed to this receivership by a decretal order of one of the justices of this court, on a bill, filed by George C. Kenyon, administrator of William A. Gardner, the deceased partner of the above firm, against Benjamin W. Gardner, the surviving partner, for the administration of the partnership property, and to compel the application of the same to the payment of the copartnership debts. He is therefore an officer of this court, invested with the whole equitable title to the partnership property without an assignment, and in this suit certainly represents the interests in that property of all parties to the suit in which he was appointed, if not of all persons *not* parties thereto. *Hutchinson* v. *Lord Massareeve*, 2 Ball & Beatty, 55. *Davis* v. *Duke of Marlborough*, 2 Swanston, 118. *Green* v. *Bostwick*, 1 Sand. Ch. R. 186. *Mann*, Receiver, v. *Pentz*, 2 ibid. 271, 272. *Waring* v. *Robinson et al.* 1 Hoffman Ch. R. 532. *Iddings* v. *Bruen*, 4 Sand. Ch. R. 422–427; in which last case see a full discussion of the interest and power of a receiver of copartnership property in and over it. According to what is understood to have been the old English practice, and at all events the most convenient practice, and that generally adopted in this country, he may, in order to enable him to perform his trust, *suo motu*, and without special leave, (which he must, according to the present inconvenient practice in England, obtain from the court appointing him,) bring suits to possess himself of the estate to which he is officially entitled, incurring no risk except as to costs; and, least of all, have the persons sued a right to object that he brings his suit without such leave. *Green* v. *Bostwick*, 1 Sandf. Ch. R. 186. *Iddings* v. *Bruen*, 4 ibid. 424–426. There is no danger in this; for, as an officer of the court, he is always subject to its control upon proper application, and if he recover or possess himself of property, it is in *custodia legis*, and subject to administration by order of the court.

Now, the representative of the deceased partner, who brought the bill under which this receiver was appointed, had a clear right in equity to have the property of the firm of his decedent applied, in relief of the estate represented by him, to the payment of the copartnership debts. *Egberts* v. *Wood*, 3 Paige, 526, per Walworth, Chan. When that representative obtained the appointment of a receiver, he surrendered all his dominion over the firm property, so far at least as suit in equity was concerned, into the hands of the receiver; who, by virtue of his appointment thus made, became, at least, invested with all the rights and equities of the deceased partner, for the purposes of the trust with which he was clothed. *Waring* v. *Robinson et al.* 1 Hoffman's Ch. R. 532.

We make these remarks *in limine* as to the legal *status* of the plaintiff to this bill, because one point taken in defence to it is, that the plaintiff, as receiver, represents only the creditors of the late firm of Gardner & Brother,—that the creditors of a firm have no equitable lien upon the copartnership property for the payment of their debts, but can only work out such a lien through the equities of the copartners, who must therefore, in some form, be represented in the bill; and many authorities are cited to the last part of this proposition. Now if the rule just referred to had any application to a case like the present, surely no one could more completely represent the equitable right of the deceased copartner to have the copartnership property applied to the payment of the copartnership debts, than a receiver, appointed by this court, upon the bill, and at the instance of the legal representative of the deceased copartner, and invested, by virtue of his appointment, with all the rights and equities both of the decedent and of his representative. But we apprehend that the rule in question has no application to the case of a copartnership dissolved by the death of one of the copartners, especially if the surviving partner be insolvent, or where, though living, one or both of the copartners become bankrupt, or where they are discharged under insolvent acts, so that their property is placed in the hands of the assignees appointed by law to make distribution thereof. It is true, that whilst the copartners are administering their own funds, the copartnership creditors

have no lien upon the joint effects; nor have the creditors of the individual partners any lien or priority of claim upon the separate property of their respective debtors; but when, as in case of dissolution of the copartnership by death, a trust is created by implication of law, as to the joint property in the hands of the surviving partner, of which he is the trustee and the joint creditors are the *cestuis*, or when, as in case of bankruptcy or insolvency of either or both of the copartners, the property passes into the hands of assignees by way of an express trust for the benefit of all parties according to their equitable rights, a lien attaches in equity at once, according to those rights, upon the joint property in favor of the joint creditors, and upon the separate property in favor of the separate creditors of the copartners. This lien is, we think, familiarly administered in equity, in favor of those respectively entitled to it, upon their own direct application, and as their own equitable right. Even the courts of law administer it in New England, under our attachment laws, in case of *quasi* insolvency, by giving to the creditor of the firm, though subsequently attaching the firm property, a priority of lien and payment upon and out of such property over the separate creditor of one of the copartners first attaching it, thus setting aside the legal right of prior attachment, in favor of the equitable lien of the copartnership creditors upon the copartnership property; and see *Kirby* v. *Schoonmaker*, 3 Barb. Ch. R. 47–51, incl. per Walworth, Chan.; *Wilder* v. *Keeler*, 3 Paige, 167, 170–176; *Hall* v. *Hall*, 2 McCord's Ch. R. 302.

But however this might be, were this a case in which the creditors of the firm were the only applicants to the court for the enforcement of their supposed lien upon the copartnership property, there can be no doubt but that the plaintiff in the case before us, as a receiver appointed by the court upon the bill of the administrator of the deceased partner to compel a proper administration of the assets of the firm and their application by the surviving partner to the payment of the copartnership debts, completely represents the equitable rights of the administrator and of the intestate in that respect, and that the objection to the relief prayed for by this bill, on that ground, totally fails.

Having disposed of this preliminary objection supposed to

exist from a want of equitable interest in the applicant for our aid, we propose to look into this case upon the bill, answer, and proofs, and to ascertain what the plaintiff asks, and upon what grounds; and whether he is entitled against the respondent to what he claims, or to any relief *upon the grounds upon which he asks it.* The cause has, upon the main point supposed to be involved in it, been very fully and ably argued at the last hearing by the counsel on either side, and much labor has been saved to us by their full citation and lucid exposition of the authorities upon which they respectively rely.

The bill, besides stating the facts which relate to the formation of the late firm of Gardner & Brother, to the death of William A. Gardner, one of the copartners, the insolvency of the firm at his death, and to the plaintiff's appointment as receiver,—in substance alleges, that after the death of his brother and copartner, Benjamin W. Gardner, the surviving partner, took sole possession of all the property of the firm, including a certain lot of land, with a planing, grist, and saw mill upon it, with their machinery and fixtures, and continued to carry on the business of the firm with the property of the firm, notwithstanding the dissolution of the copartnership by the death of his copartner; contracting new debts on account of the firm, but paying none of the old ones, and that these were at the time of the conveyance hereafter to be spoken of, as well as at the death of William A. Gardner, outstanding to a large amount. It further alleges that the planing, grist, and saw mill, with their fixtures and machinery, are in the possession of the respondent, Champlin, who holds the plaintiff out of the same, claiming the same, or some interest in the same, by virtue of a certain deed of the date of the 8th of June, 1855, executed by Benjamin W. Gardner, the surviving partner, (named in the bill as a defendant,) and which purports to convey an undivided half of that property to Champlin for the "*pretended*" consideration of $1,250; and that "*said pretended sale was made by the said defendants with the design and intent that said Gardner (the surviving partner) should appropriate said sum to his own use, and carry the same away with him as hereinafter mentioned, and said deed was executed at ten o'clock, and the said Gardner*

*left the state immediately. afterwards."* The bill afterwards alleges " that immediately after executing the said pretended conveyance to the said Champlin on the 8th day of June, 1855, the said Benjamin W. Gardner abandoned the concerns of said copartnership, absconded from said East Greenwich, *conveyed or accompanied by said Champlin out of town,* carrying with him a large amount of money, including said $1,250, the *pretended* consideration of said conveyance, and all the proceeds of the effects of said copartnership, &c." Again, after setting forth the equitable lien of copartnership creditors upon the property of a firm in the hands of the surviving partner, and the trust for them with which such property in his hands is clothed, and the consequent equitable duty of Benjamin W. Gardner as surviving partner in the administration of the assets of the firm, and that the property and effects so *pretendedly* conveyed to Champlin are in his hands chargeable with the same trusts, as in the hands of the surviving partner, Benjamin W. Gardner,—all of which, it will be noticed, are mere conclusions of law properly drawn from the facts above recited as alleged in the bill—the bill goes on to charge the defendant, Champlin, at the time of his *pretended* purchase, not only *" with full notice"* of the trusts under which Gardner, who executed the deed to him, held the copartnership property, as matters of law he was bound to take notice of, but " that he (Gardner) did not intend to apply the proceeds of said pretended sale to the payment of the debts of said copartnership, *but to his own use* AND TO ABSCOND WITH THE SAME." It is true, that the bill then immediately goes on to charge Champlin with notice of the existence and carrying on of the copartnership—of the death of William A. Gardner— of the alleged fact that Benjamin W. Gardner, as surviving partner, continued to carry on the business of the firm—of the fact that the property pretended to be conveyed to him was copartnership property, and that the firm owed a large amount of debts at the time of the death of William A. Gardner, and continued to do so till and *at the time of the conveyance;* but these last allegations are connected with the previous ones by the form of the expression which is " and at the time of the said *pretended* conveyance to him, *as before shown."*

The bill then goes on to aver that Gardner had no right to make and execute the said pretended deed " of said undivided half of said real and personal estate, and of other personal estate *in the manner above showed,* and the same ought in equity and good conscience to be declared *null and void, and set aside accordingly,* and the said property and effects described therein ought to be· applied, when sold, to the payment of said copartnership debts."

The concluding averment of the stating part of the bill, as it was originally filed, is, " that said pretended deed," executed, &c., " is a *fraudulent conveyance* as against said copartnership creditors, and as such ought to be *set aside* accordingly," and then to show in what sense it is intended that it was fraudulent, is introduced immediately thereafter, by amendment, the following statement: "And your orator further shows that the said Benjamin W. Gardner, before he left East Greenwich, in June last, left with said Samuel A. Champlin a power of attorney, empowering said Champlin to defend all suits and attend to other matters for him."

The *second, third, fourth,* and *fifth* interrogatories of the bill are directed to the discovery from Champlin of his knowledge of Gardner's intent to abscond with the purchase-money, and of his alleged aid in getting him off, and of the amount of money he carried off; and an interrogatory, filed at the same time with the amendment as to the alleged power of attorney left by the latter with the former, is pointed to the purpose of discovering the existence of such a power, and of compelling its production. The prayer of the bill is, that a decree may be passed, declaring the deed of June 8, 1855, " *to be null and void, and ordering the same to be surrendered to be cancelled,* and the property and effects purporting to be conveyed thereby, to be *wholly* exonerated and discharged therefrom, and sold, and the proceeds applied, or that the said sum of $1,250 may be paid by the said defendants and applied, to the payment of the debts of said copartnership," and for an injunction restraining Champlin from disposing of the same, and for general relief.

We have been thus special in our analysis of this bill, for the

purpose of showing, that it is not, as contended by the counsel for the complainant, a bill framed with a double aspect,—charging either an actual or a constructive fraud,—or which leaves any pretence from its allegations, if that would make any difference, of its being treated by us in that way. On the contrary, in all its parts, from the first of the stating part to the prayer inclusive, with perfect unity of design, this bill charges the respondent, Champlin, with the gross fraud of conniving with the absconding partner to cheat the creditors of the late firm of Gardner & Brother, by taking a conveyance of partnership property from him when he was upon the point of absconding, and with full knowledge of his design to carry off for such a purpose the proceeds of the sale; and in furtherance of this design, that he both made the purchase, and assisted him to get away, retaining a power of attorney to enable him to defend both, as well as he might, against the consequences.

Now, the answer specifically denies every fact and intent stated as constituting this actual fraud; and except the fact that Gardner did abscond with the purchase-money on the night of, or during the morning after, the deed in question was executed, and that there seems to have been some parade before the justice of the peace who witnessed and acknowledged the execution of the deed by the grantor, of paying the consideration money in his presence, and of having him to count the same, there is no proof, although some was attempted to be made, which affects the respondent with actual participation in the fraudulent scheme of Gardner. We do not think that the mere circumstances which we have stated are sufficient to overcome in a court of chancery, the technical force of the sworn answer; and it being proved to our satisfaction that the respondent had previously, at auction sale, purchased of the administrator of the deceased partner, and the surviving partner jointly, and paid for, the movable property connected with the planing-mill, &c. thereby showing an open design of becoming the purchaser, if he could, of these works; and it being also shown by proof, that from the nature of his business he was likely to become, and from his means in hand he was able to become, the purchaser, and to pay for such a property, we have all come to the

conclusion that we cannot find the intent and participation charged to be proven, and that we cannot therefore give relief upon the ground stated in the bill.

The question which then arises is, whether, dropping this charge, which veins and intermingles with the whole frame and texture of the bill, and rejecting it as surplusage, we shall be justified, by the rules of the jurisprudence which we here administer, if, on the allegations of the bill we can find some inferior ground of relief than the actual fraud charged, of giving relief on that ground under this bill? It is said by the counsel for the complainant that we may and ought, and he seems to argue as if, refusing to do so, we should be guilty of sacrificing the inherent justice of the case to a mere rule of chancery pleading and practice. Now, grant that this be so, what right have we to dispense with rules established by wisdom for our guidance in the exercise of a jurisdiction which, considering the fallibility of human judgment, necessarily leave to us quite latitude of discretion enough? Whilst, on the one hand, we know no system of jurisprudence more beneficial in its administration than that of the English chancery, governed, as it is, by fixed and certain rules and principles, and flexible only to circumstances in the modes of relief of which its forms render it capable, we know of none, considering its power of specific action, which would become so oppressive, if, flexible in principles and rules as well as in its modes of relief, it were so altered as to make the chancellor the tyrant, instead of the judge, of the causes before him.

Whilst the door of the court has always been left wide open to relieve those who suffer from acts or practices of fraud—a great head of its jurisdiction—it has always been most careful to require of those who apply to it on this ground to scrutinize their causes of complaint before they enter it, and to allege and thus give notice, on the one hand, of that which they intend to prove, and to prove, on the other, that which they have alleged as the ground of the relief applied for. In *Montesquieu v. Sandys*, 18 Ves. 302, 309, 312, 314, which was a bill brought by a client against an attorney to set aside a purchase made by the latter of the former's interest in an advowson, which had,

by accident, turned out very advantageous to the purchaser, Lord Eldon had occasion to state and apply the first branch of this rule. The case stated in the bill was, that the attorney, in the course of his employment, had gained a knowledge of the value of the right sold, which his client had not, and misrepresented the value to him, and that the client ignorantly confiding in the representation, made an unreasonably low, as it turned out to be, proposal to sell, which the latter had availed himself of, proposing to deduct the price from his solicitor's bill for services, which had not then been delivered. It appeared from the answer and proofs, that the attorney, though employed by the plaintiff in some other matters, had gained no such knowledge as charged, and had made no such misrepresentation of value; and that the bargain had been made by both in equal ignorance; but that the purchase-money was paid by deduction from the bill of the attorney not then delivered, which, at the time of the bargain, was not equal to it, though the bill became large enough some three years afterwards, so as upon final settlement then to absorb the purchase-money, and leave a balance, paid by the client in money. At the time of the execution of the conveyance no money was paid, but a receipt for the amount of the purchase-money was given by the client to the attorney, as if it had been actually paid by the latter; when, in truth, it was only understood at the time that it was to be deducted from the bill of the attorney, not then equal to it, when that bill should be delivered and settled. Lord Eldon thought that if these last facts, or the case made by them, had been stated in the bill, relief might have been granted, upon the principles established in equity, with regard to dealings between attorney and client; but that the case stated not having been proved, " though," to use his own words, " the transaction as to the receipt was very incorrect, it would be far too much to give relief upon those circumstances which are not made a ground of complaint upon the record." He dismissed the bill, however, without costs. So strict is this rule, as a general rule in chancery practice, that nothing can be proved which is not stated by the bill, unless it is put in issue by the answer, that in *Powys* v. *Mansfield*, 6 Simons, 9 Eng. Cond. Ch. R. 565, 566, the vice-

chancellor ruled that in such a case, evidence could not be read to prove the fact, even on behalf of an infant. This branch of the rule of equity pleading and practice referred to,—that is, *that* branch of it applicable to pleadings *wanting* in allegations sufficient to give notice of, and afford a basis for the proof upon which relief may be given or the defence may stand, is alike applicable to all other cases, as well as to cases of fraud. The other branch of it is, however, specially applicable to alleged cases of fraud, in the sense of actual deceit or covin. It is thus laid down by Lord Truro, in *Price* v. *Berrington*, 7 Eng. L. & Eq. R. 260, as "an established doctrine of the court." "When the bill sets up a case of actual fraud, and makes that the ground of the prayer for relief, the plaintiff is not entitled to a decree by establishing some one or more of the facts quite independent of fraud, but which might of themselves create a case under a totally distinct head of equity from that which would be applicable to the case of fraud originally stated." The rule is spoken of by his lordship as one repeatedly recognized, especially by Lord Cottenham, and as then (1851) lately acted upon in the case of *Gibson* v. *D'Este*, in the house of lords; a case by the way, with which his lordship must have been quite familiar, as the bill filed in it charged fraud in the sale of a piece of land upon the lady who subsequently became his wife, and is reported in 1 Clarke & Finelly's House of Lords Rep. (N. S.) 620, under the name of *Wilde* v. *Gibson*. This rule, it will be noticed, does not suppose the bill to be *defective* in allegations to be met by proof establishing another ground of relief than that of actual fraud, but to be full in that respect; the difficulty being, that these allegations are pointed with the others to such fraud, as the distinct ground of the relief which the bill invokes. Nor is the rule, as was remarked by counsel in *Price* v. *Berrington*, *sup.* p. 255, "founded on any martinet principle of pleading." On the contrary, Lord Cottenham, speaking of it, in *Glascott* v. *Lang*, "as a rule generally acted upon," propounds it also "*as founded in justice*," "because," he continues, "the door of this court being always open to allegations of fraud, it would be unjust, and much to be deprecated, to afford any encouragement to such allegations, by allowing a

17*

party to try the experiment of obtaining relief on that ground, and if it failed, to fall back upon his bill for some inferior kind of relief." This we deem to be sound morality, and fit to be observed by those who sit in the gateway of a court of chancery to administer the high-toned justice of that court.

Now this rule, and upon the very ground given for it by Lord Cottenham, was adopted and applied by this court in the case of *Mount Vernon Bank* v. *Stone,* 2 R. I. Rep. 129, 132, 133, decided at the March term for this county, 1852; but is supposed, by the counsel for the plaintiff in this case, to have been dispensed with by the court in the case of *Masterson* v. *Finnigan,* 2 R. I. Rep. 316, 318, 319, decided at the September term of the court for this county in that very year. It is to be regretted that the grounds of the decision of the court in the last mentioned case, of which we have only the reporter's statement, were not more fully and distinctly given; because, as given in the report, they do seem to imply the strange power in the court of dispensing with an established rule of justice, just recognized by them, upon some loose notion of hardship, although the application of the rule be invoked by the very party for whose protection it was, in part at least, established. It is true, that in *Glascott* v. *Lang, sup.,* which was a bill for the cancellation of a bottomry bond on the ground of fraud—the bond being then in suit in the court of admiralty—Lord Cottenham did, as the amount was small, to save expensive litigation, propose to *the parties,* notwithstanding the objection to relief above stated, that they should allow the bill to proceed and have the whole matter adjudicated under it. The *defendants* were ready to agree to this, because, as stated by their counsel, " as the amount of the bond was in court, the effect of dismissing the bill at once would necessarily be, to restore the fund to the plaintiffs and leave his clients without any security for payment, even if they should succeed in the court of admiralty; the ship having been sold, and the proceeds received long ago by the plaintiffs." The plaintiff, however, refused by his counsel, to assent to the inquiry through a master under the bill, as proposed by the chancellor, and preferred that the bill should be dismissed; notwithstanding which, the chancellor retained the

bill *at the request of the defendants,* and ordered the proposed inquiry to be made. The mode in which Lord Cottenham dealt in this case with the bill before him, is not, as has been argued before us, any authority for our retaining this bill, if faulty in the same way, at the instance of the *plaintiff,* whose bill it is, *against the objection of the defendant.* On the contrary, *he* put the bill at the disposition of the *defendants,* to have it dismissed upon the ground stated, if they required it, or to have it retained and their rights ascertained under it, if they deemed that their interests would be better subserved by such a course. Upon examining, too, the very imperfect report of the facts in the case of *Masterson* v. *Finnigan, sup.,* the decision of the court will be found to require no such assumption of dispensing power as the report makes the court claim as the ground of their judgment. The bill, in that case, as the subjects of the relief prayed by it, embraced *two* adjoining parcels of land, of the larger of which, partition had been made by a sealed agreement, which the bill sought to set aside, on the ground that the plaintiff was induced to execute it by the false and fraudulent representations of the plaintiff that the instrument in question provided for a *full* and *perfect* partition of the entire premises, including the smaller lot adjoining; and the bill prayed that a new partition of the whole might be made. The answer denied the fraud charged, and stated, by way of defence, that the instrument *did* include, and *was intended* to include the smaller lot in the partition made by it; and that it was designed that the plaintiff should have one half the premises conveyed by it to her. There was no proof of the fraud charged in the bill, or, that it was not designed that the one half of the smaller lot should have been included in the instrument of partition, except that as construed by the court, it did not include it. In this state of things; the court refused to relieve against the agreement of partition executed by the plaintiff of the larger lot, but retained the bill for the purpose of making partition of the smaller lot, not included in the agreement; giving the defendant costs up to the time of the decree ordering the partition. The allegations of the bill, in other words, were not intended to apply, and did not apply, so far as they charged fraud, to but one of the lots mentioned in

it; and showed a case for partition of the other, as an inseparable incident of a joint estate at law and in equity. The court enforced the rule adopted in the case of *Mount Vernon Bank* v. *Stone*, as to all the relief claimed upon the ground of fraud; but as to that claimed in relation to the other subject embraced in the bill, and upon other grounds to which the unproved allegations of fraud did not, and could not apply, granted the relief asked, upon payment of costs up to the time of the decree for it. We do not think that this course militates at all with the rule as it seems to have been administered, at least by Lord Cottenham. In *Ferraby* v. *Hobson*, 2 Phillips, 22 Eng. Cond. Ch. R. 255, 258, 259, he examines the bill, which was a bill against a trustee, to ascertain whether it did, as argued by the counsel for the plaintiff, make a case of mere neglect or omission of duty, as distinct from the charge of personal corruption contained in the previous part of the bill; and although he found there was a charge in it, that taken by itself would bear that construction, yet that taken in its context it had reference exclusively to the charge of personal corruption. In *Masterson* v. *Finnigan*, the fraudulent misrepresentations charged related to, and the relief prayed for upon that ground applied only to, *one* of the two lots of land named in the bill; and of the other lot, of which partition was also asked, it was asked for upon the general right of one tenant in common to have partition of the joint estate as against another. The very nature of the case confined the allegations of fraud to the other subject of the bill; and where this is so, we see no reason from the rule of doing more than was done,—in effect, dismissing the bill with costs, as to that subject to which the unfounded or unproved allegations of fraud exclusively related, and retaining it and giving relief, as to the other subject of the bill. The decision, therefore, instead of being an authority against the rule and principle of practice we are considering, is, when rightly viewed, in entire conformity to that rule, and an authority for it. Since the first judicial application of this principle in this state, it has been applied by the learned judge of the first circuit court of the United States in *Fisher* v. *Boody et al.* 1 Curtis C. C. R. 206, 211, 223; by the supreme court of the

United States in *Eyre et al* v. *Potter et al.* 15 Howard's R. 42, 56; and, again, by the house of lords on appeal, their decision having been pronounced by Lord St. Leonards, then lord chancellor, in *Carson* v. *Belworthy*, 22 Eng. L. & Eq. R. 1, 5, 7, 11. This last case is not otherwise remarkable, than that the plaintiff, a poor, uneducated man, of small capacity, and who sued in *forma pauperis*,—sought to set aside a conveyance of a cottage and small piece of land, made by him to a creditor at a considerable under-value, without the advice of an attorney, and soon after it had come to him by the death by his father. Prior to his coming into this small estate, the plaintiff had executed a common money bond to the defendant, to secure a small sum of money in which he was indebted to him, and the point of the charge of the bill, the plaintiff acting in ignorance, was, that the defendant had, by false representations to the plaintiff and others, induced the plaintiff as well as others to believe, that he had by the money bond entered into a contract to sell the estate when a mere expectancy, at a price only adequate to the value of an interest of that kind, from which he could not escape when he came into the full possession of the property. The bill set forth other circumstances, with a view to show that the purchase had been obtained by misrepresentation and fraud. The proof of fraud failing, Lord St. Leonards said, that if the case had been originally brought forward as a case of a contract improvidently entered into, and hastily carried into execution, it might have had a different result; yet as it had been stated, and attempted to be proved, as a case of absolute fraud, and the appellant had failed to make out the allegations of fraud in his bill, though the case was certainly one of hardship, he must advise the house to dismiss the appeal.

In almost all these cases, it will be found that the objection to relief was not that the bill did not contain allegations sufficient to afford a basis for the inferior or secondary relief upon which the plaintiff wished to fall back, but that having mingled with those allegations, imputations of personal corruption or actual fraud, he had pointed his bill only to relief upon this higher ground, and must therefore succeed upon that ground or not at all. We do not apprehend that it is the mere use of the

word "fraudulent," or the omitting to use it, which will decide whether the bill points or not in such a direction. The word may be used in such a context as to indicate that no more is intended by it than such constructive fraud as courts of equity raise upon certain facts, or imply from contracts between parties in certain relations, and which, from a policy based upon a wide and various experience, such courts deal with as fraudulent *in law* in order to ward off the *danger* even of the perpetration of *actual* fraud. The word "fraudulent" may *not* be used, and yet the facts alleged may, especially when coupled with the species of relief that is sought, indisputably show that the ground upon which relief *is* sought is the actual fraud or personal corruption of the defendant in the transaction impeached in the bill. Based, as we have seen, upon a principle, the rule in question deals not with mere words or forms of expression. In equity pleading, there is great latitude in the use of these, unknown to the old formed actions of the common law, or even to those actions of the case which have grown out of the equity of the statute of Westminster 2d. There is more difficulty therefore in detecting the true ground or grounds upon which relief is sought in courts of equity than in the courts of law; but when detected, the result in the former is precisely the same as in the latter, as to charges of deceit or fraud. In either forum, if they are the ground of the action, they must be proved; or, however good may be the case of the plaintiff if brought forward in another way, he must fail in the way in which he has chosen to put it. We have discussed this question more at large in this case than its difficulty would seem to require, because of the supposed contradiction with regard to it of the two cases before referred to as decided by this court, and because of its frequent occurrence here,—twice in cases argued before us during this very fall circuit.

We have already commented upon the frame of this bill, and have come to the conclusion, considering in addition to what we have already said of it, that the special relief prayed, is, that the deed impeached may, in effect, be declared "to be *null and void*," and "be *surrendered to be cancelled,* and the property and effects purporting to be conveyed thereby be *wholly* exonerated

and discharged therefrom, and sold," &c., relief proper in this court only in case of actual fraud, that it does distinctly put forward as the sole ground of relief, a gross case of actual designed fraud on the part of the respondent, Champlin, in the taking of the deed, which the proof, though attempted to be made, has failed to establish. Under such circumstances, the course established for us by our own decisions, and by decisions of the highest authority elsewhere, is, that this bill must be dismissed with costs ; but, as the bill has been filed by an officer of this court under legal advice, in pursuing the interests of a numerous body of creditors, who, together with himself, are in no fault in this matter, it must be dismissed without prejudice to any proper application made by him in their behalf, and the costs will be allowed to the plaintiff out of any funds which have come, or may come into his hands, as receiver.

As the matter of this bill may come before us in another form, and the other questions involved in it have been very fully and elaborately argued on either side, it may be as well for us now to express our opinion with regard to them, for the future direction of the parties, and with the hope that it may put an end to further litigation. These questions are—

*First.* Was the lot of land, with the planing-mill, saw-mill, and grist-mill upon it, with their fixtures and machinery, in equity, the property of the late firm of Gardner & Brother, or was it the joint property of the two members of that firm, held by them, and therefore they to be treated by us in respect to it, as tenants in common ? and

*Second.* If partnership property, has the respondent acquired a title to an undivided half of it by virtue of the deed from Benjamin W. Gardner, the surviving partner, under such circumstances, as exonerate it from the trust with which it was clothed in favor of the creditors of the firm whilst in the hands of his grantor, or under such, as keep it subject to that trust in *his* hands ?

With regard to the first of these questions, which is principally a question of fact, we entertain no doubt, upon the proofs submitted to us. As no articles of copartnership have been produced, the precise day or month, even, in which the copart-

nership of Gardner & Brother was formed, does not appear; but that such a partnership existed some time prior to the death and up to the death of William A. Gardner, is admitted; and that this copartnership was in fact formed some time prior to the 19th day of December, 1851, and in the fall of that year, is abundantly proved by the course of dealing of William A. and Benjamin W. Gardner as copartners, sworn to by the three Hunts, Wall, Salisbury, and Pearce, witnesses whose depositions were taken and read on behalf of the complainant. It appears from this testimony, that as early at least as September, and certainly in the month of November of that year, the Gardners not only openly declared themselves to be copartners, but as such acted and contracted, and obtained credit both for work and materials, in their joint business of housewrights. In the month of December of that year, they bought the lot of land upon which their planing-mill, &c., was subsequently built, at auction sale, of the town of East Greenwich; the respondent, Champlin, bidding off the same in the name of William A. Gardner—the deed of the lot being given by the town treasurer of the town, at the request of William A. to his brother, Benjamin W., and himself, as tenants in common, in fee—and William A. Gardner paying to the town treasurer, as the latter swears, the consideration ($410) of the deed. According to the same witness, the two Gardners immediately built a shop upon the lot purchased by them, in which they worked together; and in the spring of 1852, built upon it the planing-mill, &c., in question. It appears, too, from the testimony of the witnesses Wall and Salisbury, that the brick and lumber, with the exception of some beams obtained from Providence, were purchased in the name and on the credit of the company, from the firm of Pearce, Salisbury & Co., as well as that the machinery for the first mill was purchased in Albany, by that firm for the firm of Gardner & Brother, charged to the latter firm, and paid for, in whole or part, by them. It is also proved, that the two Gardners worked together on the buildings in question—contracted for other work and materials for the same in the name of their firm, and that from the time of their completion, up to the time of the death of William A. Gardner, the works placed upon the lot were operated and used

exclusively in the copartnership business. It appears, too, that when obtaining credit, and for the purpose of obtaining credit for the main materials, brick and lumber, out of which the works in question were built, they stated, upon inquiry, their means as copartners to the furnishers, and that the materials were obtained upon the joint means and the credit of both. It does not distinctly appear, since no company books have been produced, that the consideration-money for the lot ($410) was carried into the copartnership accounts ; but it does appear that it was in fact paid to the town treasurer of East Greenwich by William A. Gardner, the deceased partner, and not by Benjamin W. the surviving partner ; and in such a state of the proof, it is at least not disadvantageous to the latter to infer, that it was a part of the $1,500 contributed by the former to balance the money brought from California by the latter, from which the $3,000 was made up, which, according to their declarations, was to constitute the capital of the concern to start them in their copartnership undertakings. There being nothing, in our view, of any weight produced on the other side to check this strong and uniform current of the testimony, it not being made to appear, in contradiction or in addition, as it might be, if such were the fact, that any portion of the cost of this lot or of these buildings and machinery was paid by Benjamin W. Gardner, or even by William A. Gardner, out of their separate means, the conclusion of fact, to our minds, is irresistible, that this lot was bought and these works erected by the firm of Gardner & Brother, out of the capital, or upon the credit of the firm, exclusively for the use of the firm, and were, during the whole time of its existence, that is, up to the death of William A. Gardner, used exclusively in the business of the firm; and hence, in a court of equity, that this property, notwithstanding the form of the deed, is to be viewed and treated as the copartnership property of the firm of Gardner & Brother.

The counsel for the respondent is mistaken in supposing, under such a state of facts as this, that the fact that the deed of this lot runs to the individual members of the firm of Gardner & Brother, as tenants in common, without describing them as copartners, raises a presumption, in the view of a court of

equity, that the property, thus bought and used, is intended to be kept as the separate property of the respective partners, which stands, until some express and even written proof is given to show the contrary intention. A court of equity does not ordinarily, in relation to such a subject, base its presumptions upon mere forms, but rather upon facts which lead to the substantial truth and justice of the case. The well-settled presumption in equity is precisely the other way. As said by Chancellor Walworth, in *Buchan* v. *Sumner*, 2 Barbour's Ch. R. 198, 199, " Where real estate is purchased with partnership funds for the use of the firm, and without any intention of withdrawing the funds from the firm for the use of all or any of the members thereof as individuals, it has never been doubted in England, that such real estate was in equity, to be considered and treated as the property of the members of the firm collectively ; and as liable to all the equitable rights of the partners as between themselves. And for this purpose the holders of the legal title are considered, in equity, as the mere trustees of those beneficially interested in the fund, not only during the existence of the copartnership, but also upon the dissolution thereof by the death of some of the copartners or otherwise." And see the cases cited by him, and to same effect, *Hoxie* v. *Carr*, 1 Sumn. 181, per Story, J. In this last case, Mr. Justice Story says : " But the circumstance that the payment has been made out of the partnership funds, especially if the property purchased be necessary to the operations of the partnership business, and be actually so employed, will afford a very cogent presumption that it was intended to be held as partnership property ; and in the absence of all countervailing circumstances, it will be absolutely decisive." " In whosoever hands the legal title may be placed, whether in one or all of the copartners, and whether the deed describes them as copartners or as tenants in common, if the property be purchased with the funds, and for the use of the firm, the decisive presumption in the absence of proof to the contrary is that it was intended to be held as partnership property." *Hunt* v. *Benson*, 2 Humph. 459 ; *Buchan* v. *Sumner*, 2 Barb. Ch. R. 205 ; *Smith* v. *Tarlton*, ibid. 336, 338 ; *Delmonico* v. *Guillaume*, 4 Sandf. Ch. R. 366 ; *Dyer* v. *Clark*, 5 Metcf. 578,

581; *Howard* v. *Priest et al.* ibid. 585; *Burnside et al.* v. *Merrick et al.* 4 Metcf. 541; 1 Am. Lead. Cases, Hare & Wallace's notes, 488, and cases cited; Collyer on Partn. § 154, where see the result of all the authorities stated. The line of cases cited and relied on by the counsel for the respondent upon this subject will be found to refer to the question whether real estate of a copartnership, upon the death of one of the copartners, and *after the debts have been paid and the equities adjusted between the several members of the firm,* belongs, in equity, to the executor or administrator of the decedent as a part of his personal property; or whether the beneficial interest, as well as the legal title, in the decedent's share of such real estate, descends to his heirs at law. Upon this question of equitable conversion of real into personal estate as between the heir and personal representative of a deceased partner, Lord Eldon overruled the latest decision of Lord Thurlow and the decision of Sir William Grant, and held in *Devaynes* v. *Devaynes,* Montague on Partn. App. 97, in favor of the conversion, and consequently in favor of the title of the executor or administrator, to such surplus. His ruling upon this point seems to have been generally followed by the later chancery judges in England; although two or three recent cases, in which the circumstances were special, have been decided in favor of the heir. The American cases, on the other hand, generally adopt the conclusion that the deceased partner's share of the surplus of the real estate of the copartnership which remains after paying the debts of the copartnership, and adjusting all the equitable claims of the different members of the firm as between themselves, is, as between the heirs at law and personal representatives of the deceased partner, to be considered and treated as real estate. *Dyer* v. *Clark,* 5 Metcf. 578, 579; *Howard et al.* v. *Priest et al.* ibid. 585, 586; *Burnside et al.* v. *Merrick et al.* 4 Metcf. 541, 544; 1 Am. Lead. Cas. Hare & Wallace's note, 491, 492, and cases cited. The whole subject is, however, so luminously treated by Chancellor Walworth, in *Buchan* v. *Sumner,* 2 Barb. Ch. R. 198 and onwards, with a full discussion of the cases, English and American, up to the time of his judgment (1847), that nothing need be added; and indeed the question of what shall become of any surplus of such prop-

erty, after the equitable trust under which it is held is satisfied out of it, is so foreign to the case before us, that we should not have mentioned it, except in answer to the cases with regard to it, cited and relied upon by the counsel for the respondent.

It was noticed, too, by the counsel for the respondent, that in *Dyer* v. *Clark, Howard et al.* v. *Priest et al.* and *Hoxie* v. *Carr,* the respective deeds under which the partners in those cases held the real estates there in question, described them as copartners, as if that were the ground of decision in either of those cases. That the deed did describe the grantees as copartners is true of the case of *Dyer* v. *Clark;* but it is true only of one of the *two* parcels of land in question in *Priest et al.* v. *Howard et al.* which were conveyed by separate deeds; the land and store in Moon-street, Boston, being conveyed to the two partners as tenants in common, and not describing them as copartners. 5 Metcf. 583. In *Burnside et al.* v. *Merrick et al.* 4 Metcf. 537, decided at the same time, the deed does not seem to have described the grantees as copartners, as is shown by the mode in which the court state the question on page 541. It is evident, therefore, that the absence of such a description in the deeds was not deemed controlling in either of those decisions. In *Hoxie* v. *Carr,* Judge Story notices that one of the deeds from a former proprietor to the copartners, Reynolds & Hoxie, of *his* interest in the thirty-seven acres of land thereby conveyed, bounds it, on one side, on a three-acre lot, stated to belong to the West Greenwich Manufacturing Co. and which formed part of the premises in dispute, and that the deed from Reynolds to Carr spoke of the whole as *formerly* belonging to the same company. No doubt a chancellor would seize hold of such a feature in a case before him, for the purpose of strengthening the presumption raised by the substantial fact that the estate was purchased with the copartnership funds, for the copartnership use; but we have already seen that Judge Story put the latter as the main ground of presumption and not the former fact; liable to be rebutted, of course, by any controlling agreement or act of the copartners. This feature deemed so controlling exists in very few of the American cases, and in none of the English cases that we recollect. In *Delmonico* v. *Guillaume,*

2 Sandf. Ch. R. 366, the deed of the farm adjudged by the chancellor to be copartnership property, was originally executed to John Delmonico, who subsequently executed to Peter Delmonico a deed conveying to him an undivided half. But without taking more time in commenting on particular cases, all of which have, of course, their peculiar features more or less marked and more or less controlling the judgment of the courts before which they were heard, it is clear from them, that the trust in favor of the firm is held to result from the fact that the consideration was paid by it, as in other cases of resulting trusts; and the implication of this trust is held to be confirmed by the fact that the property was bought for the use of the firm and actually used in its business, when no agreement, or conduct implying such an agreement, prior, or subsequent to, or at the time of the purchase, is proved, to indicate an intention on the part of the copartners to hold the real estate thus purchased by them in undivided shares as their separate property.

The other question involved in this cause, that is, whether the title to the property in question acquired by the respondent, Champlin, is, under the circumstances, held by him subject to, or exonerated from, the trust with which it was clothed in the hands of his grantee, remains to be considered.

Beyond doubt, a *bonâ fide* purchaser or mortgagee of partnership lands, who obtains the legal title from the person in whom it is vested without notice of the equitable rights of others in the property as a part of the funds of the copartnership, is entitled to protection in courts of equity as well as in courts of law. Per Walworth, Chancellor, *Buchan* v. *Sumner*, 2 Barb. Ch. R. 198. To this extent, and no further, go the decisions in the cases of *M'Dermot* v. *Lawrence*, 7 Serg. & Rawle, 438; *Forde* v. *Herron*, 4 Munf. 416; *Haile* v. *Henrie*, 2 Watts, 143; *Ridgway's appeal*, 3 Harris, (15 Penn.) 177, and the remark of the court in *Sigourney* v. *Mann*, 7 Conn. 11, relied upon by the counsel for the respondent. Holding, as we do, that this real estate was copartnership property, the legal title to the undivided half was held by the surviving partner, according to every authority on this subject, English and American, cited on either side, in trust, for the payment of the debts of the firm, and of

18 *

any balance that might be due to the estate of the deceased copartner upon the settlement of the partnership accounts. For the purpose of executing this trust, though but half the *legal* title was vested in him, the surviving partner had the right in equity to sell the whole beneficial interest in the estate ; and a court of equity would assist the purchaser by contract, to get in the legal title to the other half from the heirs at law of the deceased copartner, even though they were infants. *Delmonico* v. *Guillaume,* 2 Sandf. Ch. R. 366–368, and cases cited ; *Dyer* v. *Clark,* 5 Metcf. 576 ; *Howard et al.* v. *Priest et al.* ibid. 585 ; *Burnside et al.* v. *Merrick et al.* 4 ibid. 540, 541, 545 ; *Andrews* v. *Brown,* 21 Ala. 437 ; *M' Alister* v. *Montgomery,* 3 Hayw. 94. On the other hand, the surviving partner, though he may be clothed with the whole legal title, has no right or power to divert the trust property to his own private uses, in derogation of the rights of the creditors of the firm, or of those entitled to the estate of his deceased copartner. If he were to attempt it, a court of equity would, upon proper application, restrain him from so doing, remove him from the trust he was violating, and appoint a receiver in his stead. If he convey the trust estate for such a purpose to any one cognizant of the trust with actual, or under such circumstances or in such form or mode as to give constructive, notice of his design to violate it, the person taking the conveyance, though a purchaser for full value, takes it subject to the same trust, though the consequence may be to deprive him of the whole benefit of his purchase. It is only the *bonâ fide* purchaser for value, who, as in the cases already cited, purchases it in ignorance that it is copartnership or trust property, or, as in cases that might be supposed, knowing that it was copartnership property, takes the title in such form and under such circumstances as to indicate to him that it is sold and conveyed for the purpose of applying the proceeds to the proper uses of the trust, that can hold the title exonerated from the trust. Such a purchaser does not stand in equity merely upon the derivative title of his grantor. Invested with the legal title, he securely rests upon his own equities as an honest purchaser, without notice and for value—always protected—always a favorite, so to speak, in a court of equity. We agree with

the counsel for the respondent, that it will not do to say, as taking the language of the courts away from the connection in which it is used in some of the cases that have been cited, and especially in the case of *Hoxie* v. *Carr*, it has been said before us, that, under all circumstances, he who purchases the real estate of a copartnership from the surviving partner, knowing it to be such, and knowing that there are copartnership debts, will take the estate subject to those debts.   Much less is it true, as it has been contended, that such an estate can be administered, and a title to it given, only through the intervention of a court of equity.   Such a partner, certainly, and each partner of a dissolved firm, unless deprived of it by contract, has, in equity, precisely the same power to deal with the copartnership property as during the continuance of the copartnership, though liable in proper cases to be deprived of that power by the appointment of a receiver.   Per Turner, Lord Justice, *Butchart* v. *Dresser*, 31 Eng. L. & Eq. R. 121.   If the legal title in copartnership lands be in him, he may dispose of and convey the whole beneficial interest in those lands for the purpose of realizing the proceeds of sale, and of applying them to the payment of the debts of the firm and of the final balance that may be due to him as copartner; and a court of equity will not interfere most surely with this exercise, which duty imposes, or his said claims justify, of his *jus disponendi*.   So far from it, it will, as we have seen, if the legal title be in part only vested in him, or be wholly vested in another, assist him in the exercise of his right, by compelling the conveyance of the legal title to himself, or to a purchaser from him, when such a conveyance is needed to enable him to perform his duty to others, or to satisfy even the demands that *he* may have as copartner upon such property of the firm.   In such cases, the purchaser, though he know that he has purchased copartnership property, and that there are copartnership debts to be paid out of it, yet if he honestly buy the property of and pay for it to the surviving partner with no knowledge of, and under circumstances from which a court of equity implies no notice of, an intended misapplication by the partner of the proceeds of sale, will not be liable, on account of any fraud, default, or miscarriage of the surviving

partner with regard to them. It is a strict logical sequence, that the right to dispose of such property on the part of the surviving partner, implies and requires the right to buy it, on the part of an honest and careful purchaser; nor is this, as has been contended before us, one of that class of trusts, in which, notwithstanding the power of sale on the part of the trustee or surviving partner, the purchaser knowing that he is purchasing trust property is bound to see to the application of the purchase-money; or, in this case, to see that it is applied to the payment of the copartnership debts. We grant that such a notion is inferable from the language used by Mr. Justice Story, in *Hoxie* v. *Carr*, 1 Sumn. 192, if it be proper to disconnect his language from the case before him, or to suppose that he intended accurately to state all the conditions of the case in which, under all circumstances, a purchaser of the real estate of a partnership from a copartner of a dissolved firm would take the estate subject to the burden of the trust. But such an inference would do great injustice to that learned judge, who to great acquisitions added a keen sense of justice. He was speaking in relation to the case before him, which we shall have occasion hereafter to compare with and apply to this. A surviving partner, in the sense in which he is a trustee of the real estate of the copartnership, is certainly a trustee with as clear a power to give receipts for the purchase-money, upon sale, as to give receipts to the debtors of the firm, upon payment to him of the copartnership debts. This results from his power and duty, so far as necessary, to convert the partnership property into money, and therewith to pay the copartnership debts and to settle the final balance, if any, which may be due, upon settlement of the copartnership accounts, to the representative of his deceased copartner. It was never dreamed, in a court of chancery, that his fell within that class of trusts, in which, tested by the well-known distinctions of the leading case of *Elliot* v. *Merryman*, Barnardiston's Ch. R. 78, the purchaser was bound to see to the application of the purchase-money, provided he knew that he was purchasing a portion of the trust estate. Thus to limit his power of sale, would be to load the settlement of the copartnership estate with an intolerable burden,—lessen it at once to

one half its value, as a subject of sale,—and, as contended by the counsel for the complainant, necessarily draw the settlement of every such estate into a court of chancery to be administered and sold under its orders, for the protection of purchasers and the consequent realization of the value of the property of the firm. How foreign all this would be to the course of chancery with regard to such a trust, may be seen by the examination of the case above cited, and the admirably arranged collection of authorities, American as well as English, which, allowing for the difference of circumstances, have, in the main, followed it for upwards of an hundred years, found in 1 White & Tudor's Leading Cas. in Eq. with Hare & Wallace's notes, 40–60, side, incl. 1852. The only danger to a purchaser of the trust estate from a trustee of the class in which a surviving partner is to be ranked can arise from his becoming a party to a breach of trust on the part of the trustee, or from his making his purchase under such circumstances as to visit him with constructive notice that a breach of trust, as to the purchase-money, is designed. *Eland* v. *Eland*, 4 Mylne & Craig, 18 Eng. Cond. Ch. R. 427; *Hill* v. *Simpson*, 7 Ves. 152; *Champlin* v. *Haight*, 10 Paige, 275; and see *Rogers* v. *Skillicorne*, Amb. 189; *Walker* v. *Smalwood*, ibid. 676; *Lloyd* v. *Baldwin*, 1 Ves. 173; *Watkins* v. *Cheek*, 2 Sim. & Stu. 1 Eng. Cond. Ch. R. 199.

That a gross fraud has been perpetrated by the surviving partner in this case, by the sale of the undivided half of this real estate of the firm of Gardner & Brother and absconding with the proceeds, is admitted on all hands; and the question which we are to decide, is, whether the consequences of this fraud are to fall upon the creditors of the firm and the estate of the deceased copartner, or upon the respondent Champlin, who, as he alleges and proves, paid full value for his purchase. In the view in which the state of the proof compels us to regard this case, it will be a hard case whichever way we decide it; and the question simply is, whether, under the circumstances of his purchase, the respondent, Champlin, having obtained the legal title to an undivided half of the real estate of the firm in question, has an equal equity with the creditors and the estate of the deceased copartner to the beneficial interest of the moiety

purchased by him.   If he has, he cannot be disturbed in the full enjoyment of his purchase by us, whatever may be the consequences to them; if he has not, our course and duty will be plain before us, whatever may be the consequences to him. This question, in our judgment, depends upon the solution of two other questions, mainly questions of fact.

*First.* Did he know that he was purchasing the property of the firm of Gardner & Brother? needed for the payment of the debts of that firm, or to settle any balance of the copartnership accounts due to the estate of the deceased copartner? and

*Second.* Are the circumstances under which he made his purchase, and the nature of the interest conveyed to him, such as in the view of a court of equity, gave him notice of the breach of trust intended by Benjamin W. Gardner, from whom he took his deed?

He has sworn in his answer that he did not know that this real estate was copartnership property; but supposed that it was the separate property of the two copartners, held by them as separate property, according to the form of the deed under which they held it, as equal tenants in common. Now this may be quite true in one sense; for he probably did not know how a court of equity regards real property held by the copartners under a deed in that form, when bought with the money and credit, and held for the uses of the copartnership; and indeed the whole manner in which this copartnership was attempted to be settled, both by Benjamin W. Gardner and the administrator of William A. Gardner, shows a gross ignorance of the law relating to this whole subject.   But such ignorance, though it might relieve him under some circumstances from the imputation of actual fraud, cannot aid him in the view of a court of equity, when called upon to determine whether he had legal notice of a fact, or to adjudge the legal effect of his acts. If, knowing the facts that this property was bought with the partnership funds for partnership use, and was exclusively used by the partnership during the whole term of its continuance, he took upon himself to determine, from the form of the deed under which it was held by the copartners, that it was not copartnership property, he took upon himself, in a matter of law, to be

wiser than the law; and if mistaken, has no one to blame for his presumption but himself. The aid of the able counsellor who has argued his case, invoked before he made his purchase, might have been even more helpful to him in this particular than circumstances have allowed it to be.

Now, for us to doubt that the respondent, Champlin, knew these facts which appear, from the proof, to have been notorious in the village of East Greenwich, and which the partners themselves, by their daily acts and repeated declarations, took pains, for the sake of obtaining credit for their firm, to make so, would suppose on our part a degree of skepticism quite unfitting us for an office which requires us, in matters of proof, to weigh and decide upon probabilities. Although, during a portion of the time, at least, of the continuance of this copartnership, the respondent owned and occupied a farm a few miles off, in West Greenwich, yet the occasions of his business and pleasure, as proved, brought him frequently to the village of East Greenwich, where the firm did business, and where the works in question were situated, and where, also, the respondent's mother and family resided. His personal and business relations with both the members of this firm were intimate. His sister was the wife of William A. Gardner, and Benjamin W. Gardner boarded with his mother, and was thought to be attentive to an unmarried sister, and he was frequently with both the copartners, and was advised with about their business. He bid off for William A. Gardner, at auction, the very lot upon which these works were situated, when sold by the town of East Greenwich, and must have known the openly declared purpose for which it was bought. From the proof, no one could have been more cognizant of the credit and capital upon which the firm did business, and out of which they built up the property in question. This intimacy continued with Benjamin W. Gardner, after the decease of William A. His brother, Robert H. Champlin, was the original administrator appointed on the estate of William A. Gardner, and he himself took apparently a great interest in the affairs of the estate, frequently attending the courts of probate when questions concerning it were there agitated, and seeming to be a prominent actor in its affairs. He knew, or

affected to know, the precise condition of the estate of his deceased brother-in-law; and informed the witness, David W. Hunt, a creditor of the firm to the amount of $400, only some six weeks after the death of William A. Gardner, that he would get his whole debt,—that the debts of the estate were about $3,000, and that there would be property enough to pay them all; though he declined the offer of the witness to guarantee the payment of his debt for a commission of five per cent. In his answer, he admits that both at the decease of William A. Gardner and at the time of the taking of his deed, he knew that the firm owed debts, though not the amount; and although he denies that he knew that the firm was insolvent, yet it is evident from the fact, and his means of knowledge concerning it, that he must have known that it was grossly so, and that nothing was done by the surviving partner, who still continued to use the property of the firm, to pay any of its debts. A purchase made of a surviving partner thus situated and thus conducting, to the knowledge of the purchaser, would be required by a court of chancery to be made under circumstances of openness, publicity, and consultation with all interested in the estate, and in a mode quite free from suspicion in all respects, before the purchaser could affect to stand before it upon as high a ground of equity as the creditors of the firm, or the representatives of the estate of the deceased copartner.

But what were the circumstances of this purchase, and the mode in which it was effected? Without communication, so far as the evidence shows, with the representative or heirs of the deceased copartner, in the latter of whom the legal·title to the other undivided moiety of this estate was vested, and in the disposition of which the former was interested in relief of the estate of his decedent, he is found with Benjamin W. Gardner one evening, as late as 9 o'clock, rousing up a justice of the peace to take the latter's acknowledgment of the deed in question, ostentatiously hands over to the justice $1,200 in the first place to count, as the consideration of the deed, and then hands over that, with $50 more, to make the precise amount, to Benjamin W. Gardner, who delivers to him the deed. After this they are seen together in conversation coming from the house as late

as 10 o'clock, and this is the last that we hear of this consideration money or of the surviving partner, Benjamin W. Gardner, who that same night, or early the next morning, absconded with the whole of it and probably much more, and has never been heard of by the creditors of the firm since.

Now grant that, considering the denial of the answer, there is here no such proof of community of corrupt design and action between the seller and the purchaser, so pointedly charged in the bill, as will justify us in holding that the charge is proven; yet there are circumstances creating grave suspicion which cannot be overlooked in a court called upon to weigh and balance the equities of such a purchaser with the undoubted equitable rights of the creditors of the firm. If this secrecy and cover of night in this transaction were sought at the suggestion of the seller, they should have excited the suspicion of the purchaser; if sought by the latter, considering the other facts attending the execution of the deed, they go somewhat further, and certainly do not aid the case of the respondent.

But further, and most especially, it is to be considered, that this was an insolvent firm, with a large amount of debts outstanding whose existence was known to the respondent, and none of which he knew had been paid by the copartner whose duty it was to pay them, and with whom he was dealing. He was taking from this partner a conveyance of a portion of what he knew, or should have known, as a matter of law, was the property of the firm; and certainly knew, as a matter of common honesty, should be applied to the payment of its debts. This mill property should have been sold together, as a whole, if the purpose had been to realize the most from it for the benefit of the creditors; and no one could have known this better than a sharp, active man of business, such as the respondent is proved to be. To sell it in undivided shares was to sacrifice a large portion of its value; for no one would buy the other half except the respondent, and he could get it almost at his own price; and the proof is, as might have been foretold, and should have been foreseen, that, as the consequence of this transaction, neither half of this property is worth the nominal amount of the

consideration paid by the respondent for the moiety thus purchased by him.

We do not say that under no circumstances can the sale by a surviving partner of an undivided moiety of the real estate of a firm, the legal title of which is to that extent vested in him, be upheld in a court of equity. Such a sale may be made with such consent of all parties interested in it, with such publicity, and may even be so advantageous in some conceivable cases, as a mode of sale, as to be approved and even directed by a court of equity. But when, as in this case, a surviving partner in whom one half of the legal title of the real estate of the firm happens to be vested, affects privately to convey to one who knows that it is partnership property, precisely that undivided half, treating it as if it were beneficially his own, he thereby gives presage of an intent to convert the proceeds to his own use, instead of applying them to the uses of the firm whose property it is. The purchaser must know, if the property be copartnership property, that the state of the legal title cannot represent in whom the beneficial interest in it is really vested ; and in what proportion, if in any proportion, in him from whom he is taking the title. The very fact that he knows that it is copartnership property, and especially, as in this case, that there were copartnership debts outstanding to a large amount, gives him notice that others are interested in the estate than him with whom he is dealing, with whom he should in all fairness communicate, as entitled to know what disposition is about to be made of their own. But if he will privately and secretly contract with and pay his money to a surviving partner for his legal title, who by the form of the transaction is treating the matter as if he deemed the property as his own, and meant to appropriate the proceeds of sale, as his own to his own use, it is doing him no more than justice for a court of chancery to inform him, that he shall have precisely what in such a mode of purchase, and under such circumstances, he had a right to expect,—the legal title only ; the beneficial interest to go to those, to whom, in equity, it belongs. Though warned by the surroundings of the transaction, he chooses to rely solely upon the good faith and honesty in his trust of the mere owner

of the legal title, who may not, as he should know, have a *scintilla* of interest in the beneficial estate, and must abide by the result of his misplaced confidence, if such it turn out to be. If added to all this, there be, as here, circumstances of suspicion hanging about the execution of the deed, looking at the time and mode of conducting it, and the sudden absconding at the close of the transaction of the surviving partner with the proceeds of sale, we cannot estimate the equities of the purchaser at so high a value as to allow them to counterbalance the clear and undoubted rights of the creditors of the firm in whose aid our jurisdiction is invoked by the equitable representative of the rights of the deceased copartner. In *Hoxie* v. *Carr*, 1 Sumn. 193, the fact that the deed was executed by one copartner only, was alluded to by the learned judge who tried the cause, as showing " that the purchasers should and ought to have known, that without a joint conveyance or release from all the partners, no absolute conveyance could be acquired by their grantee, Reynolds. They were put upon inquiry to ascertain whether any such conveyance or release had been made ; and they cannot now set up their ignorance of law to excuse their want of diligence ;" and he then goes on to show that if the purchasers in that case had made inquiries, that they would have ascertained the very facts which the evidence convinces us that this respondent knew. Indeed, the learned and accurate commentators upon this and the class of cases to which it belongs,— Messrs. Hare & Wallace,—say, that " it is a consequence of the principle of land being affected with a trust as copartnership property, that when one partner disposes of his separate interest in land held as copartnership stock, to a purchaser having notice, he sells only his residuary interest, after the partnership debts and the share of the other partner are paid." 1 Am. Lead. Cas. Hare & Wallace's notes, 492. Such was evidently the idea of Mr. Justice Story, as expressed in his decision in the case of *Hoxie* v. *Carr et al.;* and such was the opinion expressed by the supreme court of Massachusetts in *Dyer* v. *Clark*, 5 Metcf. 580. " But if," says the learned chief justice of that court, in delivering its judgment in the latter case, " a person knows that a particular real estate is the partnership property of two or

more, and he attempts to acquire a title to any part of it from one alone, without the knowledge or consent of the other, there seems to be no hardship in holding that he takes such title at his peril, and on the responsibility of the person with whom· he deals." It is true, as suggested by the counsel for the respondent, that in case of a dissolution by death of a firm consisting of but two copartners, the sole power to dispose of the copartnership property and apply it to the payment of debts and to close the copartnership accounts, survives to ·the surviving partner; and thus, that he is the only person, as long as he is suffered to exercise the trust, to act in its administration. But the surviving partner is but a trustee; and if he from his secret and suspicious mode of dealing with the trust property, treating it by the very mode of his conveying it as if it were his own, and regardless of the interests of the creditors of the firm as to the residue, sells to a purchaser an undivided share of it, because the legal title to that share happens to be vested in himself, we deem that he thus apprises the purchaser of his design; and that, under such circumstances, his absconding with the proceeds of sale should be regarded as little more than the fulfilment of a reasonable expectation on the part of the purchaser.

Had this case been presented to us in a form in which we could have applied these reasons, the result, upon the proof now before us, would have been different; but as it is, this bill, upon the ground before stated, must be dismissed with costs.