LEMUEL L. CROCKER, Respondent, *v.* HIRAM COLWELL, impleaded with ABEL B. DIMMICK, Appellant.

When the bank account of a firm is kept in the name of one of its members, and all checks are drawn in his name, with the knowledge and assent of the others, the firm is liable upon a check thus drawn in its business.

In an action upon such a check, it is pertinent for plaintiff to show affirmatively, that the money was not advanced by him upon the individual security of the partner, whose name is signed to the check.

Where an advance is made in one place, upon a check drawn upon a bank in another, no question of usury can arise out of the transaction, as there is no loan or forbearance of money for any time whatever.

(Argued June 14th, 1871; decided September 5th, 1871.)

APPEAL by the defendant from a judgment of the General Term of the Supreme Court of the eighth judicial district, entered upon a verdict. Exceptions ordered to be heard at first instance at General Term.

The action is to recover $5,800 and interest, being part of the amount of a check, of which the following is a copy :

"NEW YORK, *March 26th,* 1867.

" *The People's Bank,*

"Pay to the order of W. S. Holmes, six thousand eight "hundred dollars.

"$6,800. O. B. DIMMICK."

Indorsed : "W. S. Holmes. "L. Crocker & Co."

Both defendants appeared and answered separately.

The second trial, which is now under review, was between the plaintiff and the defendant, Hiram Colwell, only.

The defendant, Hiram Colwell, sets up two defences. 1st, usury ; and 2d, that the check is not the obligation of the firm of Colwell & Dimmick, but is the individual obligation of Obed B. Dimmick.

The plaintiff lived in Buffalo. He was engaged in the banking business individually, at the cattle yards, near

Buffalo. The defendants lived at Hudson City, in New Jersey, and were engaged as partners in the business of buying and selling cattle on commission, as brokers. They began this business in May, 1866, and continued it for one year. Soon after commencing their business, they began to purchase cattle on joint account with third parties, and sharing the profits and losses with them, instead of receiving commissions for their services.

In January, 1867, the defendants were engaged in the business of buying and selling cattle, with W. S. Holmes, the payee in the check, on joint account. His part of the business was to come to Buffalo and purchase the cattle, ship them by the Erie railway to Hudson city, in New Jersey, and see that they arrived there. The defendants' business was to receive the cattle and to sell them. The profits and losses were divided between them.

In the latter part of February, or fore part of March, 1867, the check in question and one other check were given, in blank, to Mr. Holmes to, go to Buffalo and purchase cattle under this arrangement. He went to Buffalo, purchased seventy-five head of cattle, filled up the other check for $4,000, and procured the money of the plaintiff, to pay for the cattle on that check.

On the 26th day of March, 1867, Mr. Holmes appeared again at the cattle yards in Buffalo to purchase some more cattle. He bought seventeen head and went to the plaintiff's office to procure money to pay for them, and to obtain money to buy other cattle. He there filled up the check in question. The plaintiff paid for the seventeen head of cattle.

| | |
|---|---:|
| Being .................................... | $1,658 57 |
| Gave Holmes check for ..................... | 5,000 00 |
| Paid charges for feeding sheep ............... | 28 00 |
| Gave Holmes in cash ...................... | 96 43 |
| Retained for exchange ...................... | 17 00 |
| Amount of check in question ................ | $6,800 00 |

The seventeen head of cattle were sent by the Erie railway to the defendants, and they received and sold them. Mr. Holmes purchased some sheep with a portion of the money, and the defendants received the profits. The defendants also received a draft of $1,000, being a part of the proceeds of the check in question.

The balance of the money over the $1,658.57 paid for the seventeen head of cattle, the draft of $1,000, the money paid for feeding the sheep, and the $96.43 paid to Mr. Holmes, he claims was stolen from his pocket on the cars, when he was going to purchase more cattle.

The defendants, in their firm financial matters, used the name of " O. B. Dimmick," as representing the firm. The bank account was kept, and the cattle were paid for in that name. All of their checks were given in this name. The defendant, Hiram Colwell, knew this. He assented to the check in question being given, and said it would be right.

*D. F. Clark*, for appellant. Where one partner gives his check for money, to be used for the firm, even with the knowledge and approval of the other partner, firm not liable. (Colyer on Part., §§ 474–478, and note; Lindley on Part., 100 Law Lib., 200 marg., also 29 Law Lib , 6th series; Story on Part., §§ 134–136; Parsons on Notes and Bills, 130, and note; *Coster* v. *Clark*, 3 Edw. Ch., 411; *Jaques* v. *Marquand*, 6 Cow., 497; *Le Roy* v. *Johnson*, 2 Pet., 186; *Emly* v. *Lye*, 15 East, 7; *Skiff kin* v. *Walker*, 2 Campb., 308; *Beavan* v. *Lewis*, 1 Simon, 376; *Green* v. *Tanner*, 8 Metc., 411; *Mead* v. *Tomlinson*, 1 Day, 148, and note.) The firm only made liable by use of firm name. (*Kirk* v. *Burton et al.*, 9 M. & W., 283.) The discount of the check was usurious. (*Oliver Lee & Co.'s Bank* v. *Walbridge*, 19 N. Y., 134; *Eagle Bank of Rochester* v. *Rigney*, 33 id., 613; *Price* v. *The Lynes Bank*, 33 id., 55.)

*J. Ganson*, for respondent. Upon the question of usury, the question of intent, in the reservation of exchange, was properly submitted to the jury. (*Thurston* v. *Cornell*, 38

N. Y., 281; *Valentine* v. *Conner*, 40 id., 248; *Merritt* v. *Benton*, 10 Wend., 116; *Ontario Bank* v. *Schermerhorn*, 10 Paige, 109; *Marvine* v. *Hymers*, 12 N. Y., 223; *International Bank* v. *Bradley*, 19 id., 245; *Farmers' and Mechanics' Bank of Genesee* v. *Parker*, 37 id., 140.)

By the Court—PECKHAM, J. The defendants in this case were partners, as cattle brokers, in the city of New York, at the time of giving the check in suit, the advance of money thereon, and also at the time of giving the draft described in the complaint, doing business in the firm name of " Colwell & Dimmick." The check in suit for $6,800 was drawn in the name of "O. B. Dimmick." The check was upon a bank in New York city, and the money was advanced thereon, deducting seventeen dollars or twenty dollars therefrom, for alleged exchange by the plaintiff in Buffalo.

I think there was sufficient evidence to carry the case to the jury, upon the question whether the firm did not do business in the name of "O. B. Dimmick," in giving checks. They had been in business nearly a year as a firm; and during all that time, the financial part of their business had been transacted by Dimmick alone. He had kept the moneys of the firm in the bank in his own name; had uniformly paid the bills and accounts of the firm in checks signed by himself, and as he said, with his copartner's knowledge and assent; that checks so signed, with the like knowledge and consent, had been delivered to one or more persons, to buy cattle for the firm, assented to by Colwell substantially as binding the firm; that the firm had been in the habit of making advances for the purchase of cattle, and always by checks in the name of Dimmick. The firm's money was always thus disbursed. Colwell attended to another branch of the business, viz., selling the cattle. A large part of the business of the firm, consisted in selling cattle purchased by one Holmes, and sometimes by others. This was done on joint account as to profit and loss by the firm and Holmes, and so as to some other parties at other times.

The firm of Colwell & Dimmick continued to do business, a little more than a month after Colwell became aware of the giving of this check, and was then dissolved.

Two checks in blank were given by Dimmick to Holmes, at the same time. From the testimony of Holmes and Dimmick, I should infer that these checks were given, to enable Holmes to purchase stock, to be shipped to the firm of Colwell & Dimmick, in New York, and sold by them on joint account for the three. One check was filled up for $4,000; was cashed by this plaintiff; and the stock therewith purchased by Holmes was shipped to New York, and was sold by Colwell & Dimmick on joint account of themselves and Holmes.

The doctrine seems to be settled, that where one of two partners draws bills of exchange in his own name, and procures their discount, and carries the proceeds to the partnership account, the firm are not liable to the discounter, the money being advanced solely on the security of the parties to the bills by way of discount, and not by way of loan to the partnership. (*Emly* v. *Lye*, 15 East, 7; and see Coll. on Part., Perk. ed., § 478, and cases cited in note 3.)

A partner of a firm has a right to contract in his own name, and to obtain credit upon his individual responsibility, although he may appropriate the proceeds to the partnership, and the persons with whom he may thus deal, have the right to trust him individually, and not the firm. In such cases the firm is not bound. But this rule does not apply to secret and dormant partnerships. (Same note and cases cited.)

In the case at bar, the firm kept no other bank account than that in the name of Dimmick. They drew no checks (as they thus could draw none) except in his name. This course of business was known to both partners, as one testified from the beginning, and the other, that he did not know of it until some six months had expired. But for months it had been known to him prior to this transaction. This is not like the case of *Faith* v. *Richmond* (11 Ad. & E., 339, in 39 Com. L. R., 113).

It cannot be denied that if the partners had expressly

agreed, that the firm should draw all checks in the name of Dimmick, and kept all their money in his name in bank, that the firm would be liable on a check thus drawn in their business. Yet where the facts as here authorize such an agreement to be implied, the liability is the same. In such case it is their partnership name for that purpose.

It is objected, that the court erred in admitting evidence of what was stated to the plaintiff, when he advanced the money on the check. If the evidence be not admissible, it is wholly immaterial. I think it pertinent to show affirmatively, that the plaintiff did not trust Dimmick alone, or advance the money upon his individual security, although perhaps in this case the evidence was unnecessary.

There is no usury in this case. There can be no such question under the facts. Here was no "loan or forbearance of money," for any time whatever. There was, therefore, no usury. Had there been a loan for any time I should have had no difficulty in seeing usury under facts like these, unless the statute on that subject be regarded as repealed.

Here it was shown that checks on New York were generally above, but never below par. It is not then, very important, to inquire what it will cost to send the check by express to New York and bring back the proceeds. The testimony is harmless here. The charge of the court was correct in the points assailed.

The request to charge, that the issuing of a blank check to a third person by a partner, is a fraud upon the other partner, does not apply to this case. Holmes can scarcely be considered a third person; that is, a stranger here. He was, in fact, a partner, and had been for months, in purchasing and selling cattle with these defendants. There was, positive testimony to that effect. The request when again presented, as applicable to the facts in this case, cannot be sustained as matter of law. Partners have great powers over partnership matters. They may easily ruin their copartners if they choose to be villains. They may do it in various ways. Greater reliance must always be placed upon the integrity of a copart

ner, than upon legal remedies to make him honest, though there is no evidence in this case of a lack of integrity in Dimmick.

All concur. Judgment affirmed.