FRANCIS COLWELL *vs.* THE WEYBOSSET NATIONAL BANK *et als.*

In the case of an assignment by the survivor of two copartners made for the benefit of the firm creditors and of his own, "according as they may be entitled under the rules of law for the settlement of insolvent partnership and individual estates: "

*Held,* that the proceeds of the assignment derived from individual assets should go primarily to individual creditors, and that those from partnership assets should go to partnership creditors.

It had been the custom of the copartnership to obtain money for copartnership uses by the discount of notes made by one of the copartners to the order of the other and indorsed by him.

*Held,* that such notes so made, discounted, and used were to be treated as debts of the copartnership.

A. had received from one of the copartners a note for $6,750 to the order of the other copartner, and by him indorsed. For this note A. had given two notes, one for $4,000, one for $2,750. These last notes had been used by the receiving copartner to raise money for the copartnership. The copartnership had taken up the note for $2,750. A. had taken up the note for $4,000.

*Held,* that A. could prove his claim against the copartnership fund for his outlay in taking up the $4,000 note, and for this only.

The deceased copartner was a resident of Massachusetts. Administration was granted there and in this State, and the holders of paper made or indorsed by him, and used for the purposes of the copartnership, proved their claims against his estate in both states.

*Held,* it being conceded that no surplus would remain after paying creditors under the assignment, that the administrator should not share in the proceeds of the assignment on account of such paper.

Some of the debtors to the copartnership held claims against one of the copartners.

*Held,* that they were not entitled to a set-off.

Holders of paper made by one copartner and indorsed by the other, but issued for partnership purposes, proved their claims against the insolvent estate of the deceased partner after the copartnership had been dissolved by death, and an assignment had been made by the surviving partner.

*Held,* that they could prove against the partnership estate, withdrawing their proofs against the insolvent estate of the decedent, since it appeared that they made these latter proofs, supposing that they could prove against both estates.

BILL IN EQUITY for instructions.

*July* 14, 1888.   DURFEE, C. J.   This is a bill for instructions. It is brought by the complainant as assignee of George W. Elliott, under an assignment made by Elliott individually, and as surviving partner of the firm of George C. Elliott & Son, for the benefit of his individual and the firm creditors, "according as they may be entitled under the rules of law for the settlement of insolvent partnership and individual estates."

The firm was formed in 1870; it was composed of George C. Elliott and his son George W.; it continued to do business until

November, 1886, when it was dissolved by the death of George C. It carried on its general business in the name of George C. Elliott & Son, and was advertised and known by that name.

The assignment was made on November 30, 1886, the assignor being insolvent both individually and as surviving partner. The estate of George C. was also insolvent. Among the creditors claiming under the assignment are several banks and banking institutions, which claim as holders of negotiable promissory notes which matured after the death of George C. Two of these notes, one for $9,000 and the other for $8,750, were signed by George C. Elliott & Son, and made payable to and indorsed by George C. Elliott, and the other notes, eight in number, were signed by George W. Elliott, and made payable to and indorsed by George C. Elliott. The total amount for which these eight notes were given was $37,500. It appears in evidence that these eight notes were made and negotiated to raise money for the firm, and that the money when raised was placed to the credit of the firm and was used in its business, except in so far as it was withdrawn for the individual needs of the copartners, under a practice which was common to both of them. The evidence shows that the negotiation of notes drawn, as these eight notes were drawn, was not only one of the modes but the more usual mode employed by the firm in raising money for its purposes. As to some of the banks the evidence is full and distinct, that it was understood by them when the advances were made that the advances were for the firm; and as to the others, though the evidence as to the circumstances under which the notes were taken is not so clear, it has not been claimed that in matter of fact the differences are material. The notes are mostly renewals, after a series of previous renewals, and generally, when renewal was made, the money was put to the credit of the firm, and checked out in the name of the firm for the payment of the old note. The interest on renewal was always paid out of the funds of the firm. The notes and their renewals were all entered in the book of bills payable kept by the firm. The loan at one of the banks was originally applied for in the firm name; and when George W. brought the note, the cashier remarked to him that it did not correspond with the application, and George W. replied that that was the way they made paper

for the business of the firm.    George W., who generally procured the loans and attended to the renewals, had no business except that of the firm, and neither had George C., except such as was incident to a small place which he had in the country.

The first question asked by the complainant for his instruction is, whether the proceeds of the assignment ought to be marshalled so that those derived from individual assets shall go primarily to individual creditors, and those derived from copartnership assets shall go to copartnership creditors.    We answer the question affirmatively.    *Tillinghast, Receiver,* v. *Champlain,* 4 R. I. 173, 190 ; *Silk* v. *Prime,* 2 White & Tudor Lead. Cas. Eq. *111 and notes.

The second question is, whether the notes signed by George W. Elliott and indorsed by George C. are entitled to participate in the partnership or in the individual assets, or in both, and, if in the partnership, to what extent.    We think they are entitled to participate in the partnership assets *pari passu* with the undisputed partnership creditors.    The notes are evidently partnership paper in everything but form, and even if, for technical reasons peculiar to commercial paper, the firm could not be sued upon them directly, it seems to us that there are cases on the authority of which it might be sued, independently of them, for money lent. *Denton* v. *Rodie,* 3 Camp. 493 ; *Maffet & Rhoads* v. *Leuckel,* 93 Pa. St. 468 ; *Hoeflinger* v. *Wells,* 47 Wisc. 628 ; *Allen* v. *Coit,* 6 Hill, N. Y. 318 ; *Tucker* v. *Peaslee,* 36 N. H. 167, 176 ; *Beebe* v. *Rogers,* 3 Greene, Iowa, 319 ; *Van Reimsdyk* v. *Kane et al.* 1 Gall. 630 ; *Clark's Executors* v. *Van Riemsdyk,* 9 Cranch, 153. See, also, *Ex parte Brown,* cited in 1 Atk. 225.    It has been held that a note signed by each and every partner individually may be treated as a copartnership note, if made or negotiated for copartnership purposes.    *In re Thomas & Sivyer,* 8 Bissell, 142 ; *Maynard* v. *Fellows,* 43 N. H. 255 ; *Gay & Co.* v. *Johnson,* 45 N. H. 587 ; *Kendrick* v. *Tarbell,* 27 Vt. 512 ; *Ex parte Stone, in re Welch,* L. R. 8 Ch. App. 914 ; *Berkshire Woollen Co.* v. *Juillard,* 75 N. Y. 535 ; 31 Amer. Rep. 488 ; *Ex parte Nason,* 70 Me. 363 ; *De Jarnette's Executor* v. *McQueen,* 31 Ala. 230 ; 1 Bates on Partnership, § 453.    And it has likewise been held that a note signed by one of two partners and indorsed by the other,

if for partnership purposes, may be treated as a debt of the firm. *City Bank's Appeal,* 54 Conn. 269; *Ex parte First National Bank,* 70 Me. 369; *Smith* v. *Felton,* 43 N. Y. 419. These cases are like the case at bar, and show no stronger equities. The court in the Maine case, referring to the rule of law which has been urged here that oral testimony is inadmissible to prove any person a party to commercial paper who does not appear to be such on its face, remark that the rule has generally been enforced where the attempt has been to maintain actions at law on the paper against persons not named or indicated thereon as parties, 70 Me. 379. " But equity," say the court, " looks more to fact than to form." See, also, *Smith* v. *Felton, supra,* 43 N. Y. 419, per Allen, J.

In the case at bar the notes were all made and negotiated in the course of the business for the firm, and it is only because of their form as negotiable paper that this objection to their participation in the partnership fund can have any force. We do not think the objection should prevail.

In *Ex parte First National Bank, supra,* it was held that the holder of the note was entitled to prove it either against the individual or copartnership fund, but not against both. In the case at bar we understand that the holders prefer to prove against the copartnership fund, and we think, as regards the two funds under the assignment, they should be confined to that fund and to the surplus of the individual fund, if any remains after the individual debts are paid.

The firm of Billings Brothers are holders of a note for $6,750, signed by George W. Elliott, payable to the order of George C. and indorsed by the latter. It was given for two notes — for $4,000 and $2,750 — signed by Billings Brothers, payable to the order of H. A. Billings, a member of the firm of Billings Brothers, and indorsed by him. Said two notes were procured by George C. Elliott, to be used in raising money for his firm, and were so used. The smaller one was taken up by his firm before his death. The other was taken up after his death by Billings Brothers. The third question is, whether the holders are entitled, under the assignment, in respect of both the $2,750 and the $4,000, or of only one of them. We think they are entitled to prove against

the copartnership fund to the extent of what they have had to pay in taking up the $4,000 note, and only to that extent.

George C. Elliott was at the time of his decease a resident of Massachusetts. Administration has been taken out on his estate both in Massachusetts and in Rhode Island. The bill states that the holders of the notes before mentioned have proved them against his estate in Rhode Island, and have also proved or are about to prove them against the estate in Massachusetts, and that the estate is insufficient to pay them and other claims against it. It further states that the Rhode Island administrator claims for the estate, both in Rhode Island and Massachusetts, that it is entitled to share in the proceeds of the assignment in respect of said notes. The fourth question is, whether it is so entitled. Our answer is, that it is not so entitled, it being conceded that there will be no surplus remaining after the payment of the creditors under the assignment.

The bill sets forth that certain persons make claim against the partnership fund to the amount of about $265 for the proceeds of goods left with the firm to be sold at auction for their account, and claim to be entitled to payment in full in preference to other creditors. The fifth question is, whether their claim is tenable. The claimants do not appear to support their claim, and, merely on the statement in the bill, we do not see that they are entitled to any preference.

We do not think that Edwin L. Spink, George P. Baker, and Fred I. Marcy are entitled to the set-off claimed as stated in the bill. The debts which they owe they owe the firm; the debts which are due to them are due from George W. Elliott; and the partnership cannot be required, either by way of set-off or otherwise, to pay the individual debts of the copartners.

After the above decision had been given, the respondents, the Weybosset National Bank and the First National Bank of Attleborough, by their solicitor, James Tillinghast, September 26, 1888, filed a petition for a reargument, and for leave to introduce further evidence. The court refused to admit further evidence. As to the petition for a reargument, the court delivered the following opinion:

*March* 16, 1889.   DURFEE, C. J.   We are asked to reconsider our opinion, delivered last term, on the ground that we have misapprehended to some extent the evidence and the cases cited by us as authority, and also on the ground that the decision is very important in its practical bearings, and conflicts with the views generally entertained in business and banking circles.   Persons belonging to those circles, it is said, keep the run of the paper discounted at the banks or in circulation, noting not only the amount and the parties to it, but also whether it be individual or copartnership, and guide themselves accordingly in giving or refusing credit.   The contention is that, this being so, they have the right to know by the form of the paper whether it is individual or copartnership, whereas they are liable under our decision to be frequently misled in this respect.   There may be something in this, but we are inclined to doubt if there be much in it ; for it does not matter whether paper is individual or copartnership, so long as the parties to it are solvent, and we do not suppose that credit is often given on any nice calculation of what is likely to happen, as between individual and copartnership creditors, in case the debtors become insolvent.   There is nothing in the evidence submitted in this case to make us think so.

It seems to be assumed that the creditors of the firm are entitled to be paid out of the assets of the firm in preference to the individual creditors, because they have trusted the firm, and have acquired by such trust a direct original right of their own to be so paid.   This is not so.   It is well settled that either of two partners constituting a copartnership can convert the joint into separate property by selling out his interest in good faith to the other, and thus do away with the priority.   1 White & Tudor Lead. Cas. Eq., 4th Amer. ed. 397, and cases cited.   This would not be so if the priority of the partnership creditors were equivalent to a direct original lien.

The priority grows out of the equity of the copartners.   This is the common doctrine of the chancery courts, and the doctrine of this court enounced in *Waterman* v. *Hunt*, 2 R. I. 298.   "While a copartnership is solvent," said Chief Justice Greene, " the creditors, strictly speaking, have no equity against the assets of the partnership.   Hence the company may sell any portion of the

joint property to one. of the partners, and, if such sale be in good faith and for a valuable consideration, it will be valid against any claim by the partnership creditors. And even in case of a dissolution of the company, where such dissolution is voluntary, the partners may agree that the joint property of the firm shall belong to one of them, and, if such agreement be *bonâ fide* and for a valuable consideration, it will transfer the whole property to such partner, free from the claims of the company creditors. Story on Partnership, § 358, and the cases there cited. This results from the rule, that the application of the company property to pay company debts is the equity of the partners and not of the creditors, and, if waived by the partners in good faith, the creditors are bound." What is meant by " the equity of the partners " is the right of each of them to have the firm's property applied to the payment of the firm's debts. In this case, then, the question is, whether the equity existed in respect of both classes of notes, and if so, whether the holders of both classes of notes are not entitled to be subrogated to the equity. We think there can be no doubt but that the equity existed as between the partners in respect of both classes of notes. Logically, therefore, it seems as if the holders of both classes ought to be entitled as creditors to subrogation to their equity. The cases on the subject are mostly cases, not as here in equity simply, but under bankrupt acts or statutes of insolvency, where the course of proceeding is naturally more restrained.

In *Addison* v. *Burckmyer*, 4 Sandf. Ch. 498, A. in New Orleans, and B. in New York, entered into an agreement by which A. bought cotton and shipped it to be B. on joint account, paying its price with the proceeds of *discounted* bills of exchange, drawn by A. on B. at sixty days' sight. The bills were accepted by B., but when due were protested, and B., failing, assigned all his property for the benefit of his creditors, including half the cotton. A. applied to the assignees to apply all the proceeds to the payment of the drafts, and they declined to do so; but upon bill filed by A. for that purpose, they were decreed to do so. The point was made that the indebtedness was on the drafts alone, on which the parties were liable as drawer and acceptor separately, but not as partners. But the court, in sustaining the equity, said that the

proceeds of the cotton " should in the first instance be applied to the payment of the acceptances, which were in truth obligations given for the purchase money." The case shows clearly that, in a case essentially the same as the case at bar, the equity will hold as between the partners, and there is nothing in the case to indicate that the relief would not have been as readily granted in favor of the holder of the drafts. The complainant had made no payment on them. See, also, *Pollard* v. *Stanton*, 5 Ala. 451 ; *Booth* v. *Farmers & Mechanics Nat. Bank*, 74 N. Y. 228.

We cited three classes of cases in support of our former opinion. Of the first class were cases to the point that an action might lie for money lent, against the firm, if not on the notes. It is argued that the cases cited are irrelevant, *Emly* v. *Lye*, 15 East, 7, being more in point. In *Emly* v. *Lye*, E. L. Lye, of the firm of George Lye & Son, drew certain bills on W. Williams in favor of H. Horne or order. Horne procured the bills to be discounted by the plaintiff's assignee, a banker. The proceeds were remitted by Horne to the partnership, and allowed to him in his account with the partnership. Previously the course had been to have the bills drawn in the name of George Lye, and it did not appear that E. L. Lye had ever been authorized to bind the firm by such bills drawn in his own name. It was held that the action did not lie against the firm either directly on the bills, or on a count for money lent. The ground of decision appears more clearly in the later case of *Denton* v. *Rodie*, 3 Campb. 493, than in *Emly* v. *Lye* itself. In *Denton* v. *Rodie*, which is the first of the cases cited by us, the course of business was for one of several partners who was in America to draw bills in his own name upon the firm in Liverpool in favor of persons to whom he sold them for cash or promissory notes of short dates, applying the money so raised for partnership purposes. He periodically remitted to his copartners an account of the manner in which the money was applied, which was never complained of. The firm accepted and paid the bills till it stopped payment. The action was on certain bills never accepted, and the court held that the firm, though not directly liable on the bills, was liable on a count for money lent. The case of *Emly* v. *Lye* was cited ; but Lord Ellenborough, who tried that case, as well as *Denton* v. *Rodie*, said : " I think this case is

distinguishable from *Emly* v. *Lye*. Here I conceive the partner in America had authority from the two others to raise money for the use of the firm, and money was accordingly raised from the plaintiffs upon these bills in pursuance of such authority. The transaction is a loan rather than a discount." It seems to us that *Denton* v. *Rodie* is in point in the case at bar, not *Emly* v. *Lye*, for in the case at bar, as in *Denton* v. *Rodie*, the partner who raised the money had *authority* to raise it *for the use of the firm*, and it was raised *in pursuance of such authority*. In fact, both partners concurred in raising it so.

In *Maffet & Rhoads* v. *Leuckel*, 93 Pa. St. 468, the second of the cases cited, A. let B. have $200, taking his individual note for it. B. stated, when he applied for it, that he wanted it for the purposes of the firm of which he was a partner, and so used it. It was held that, on proof of this, the lender could recover of the firm for money lent. " It matters not," say the court, " that the making of the note was contemporaneous with the partnership debt." The case is squarely in point in favor of certain holders of the contested paper, as will be hereinafter shown.

In *Tucker* v. *Peaslee*, 36 N. H. 167, the law is broadly laid down as follows, to wit : " Each member of a particular firm is an authorized agent of the firm ; and if an individual partner obtains money or goods on his own credit for the use of the firm without disclosing the interest of the partnership in the transaction, the debt contracted is the debt of the firm, although the credit may have been given to the individual partner, and his note alone received for it." The case was that of one partner borrowing money for the partnership and giving his individual note. See, also, *Ex parte Bolitho*, Buck, 100 ; *Macklin's Executor* v. *Crutcher*, 6 Bush, Ky. 401 ; *Union Bank* v. *Eaton*, 5 Humph. Tenn. 499.

Of the second class were cases in which notes signed by all the partners in their individual names were held to be partnership notes because they were made for partnership purposes. The notes differ in form from the notes here in contest, but the reasons given for decision in these cases are certainly instructive.

Take the case of *In re Thomas & Sivyer*, 8 Bissell, 139. There the partners borrowed $5,500 for firm purposes, and gave a note

for it in their individual names, the lender requesting it, though they offered to sign it in the firm's name. The court held, nevertheless, that the lender was entitled to prove as a partnership creditor. " The true test is," say the court, " was this money.borrowed by these parties as copartners, and for the benefit of the firm, and was it so used ?" And the court cited as authority the following remark from *Richardson* v. *Huggins*, 23 N. H. 106, 122, to wit : " If the paper is made or signed in any manner in the course of the business, it is partnership paper." · The ground of decision seems to have been that the creditors were entitled to prove against the joint estate because the debt was a partnership debt as between the partners, though the creditors had insisted on their individual note. The case of *Kendrick* v. *Tarbell*, 27 Vt. 512 is to the same effect.

In *Berkshire Woollen Co.* v. *Juillard*, 75 N. Y. 535, the contract was joint and several, also obligatory on the part of any two or more of the subscribers jointly, and was signed by all the partners ; and the court held that, inasmuch as it was executed in the business of the firm and for its benefit, it should be regarded as a copartnership obligation payable out of the copartnership fund, notwithstanding that the firm name was not mentioned in it, and it appeared on its face to be simply the individual contract of the obligors. " It would be in the highest degree inequitable," say the court, " to deny to the creditors, whose funds have under such circumstances gone into and increased the copartnership assets, the right of resorting to those assets for repayment." See, also, *Filley* v. *Phelps*, 18 Conn. 294 ; *Carson, Pirie, Scott & Co.* v. *Byers & Eggers et al.* 67 Iowa, 606 ; *Weaver* v. *Tapscott*, 9 Leigh, 426 ; *Norton* v. *Seymour*, 3 C. B. 792.

It will be seen that the theory, that the holders of partnership paper executed in the firm name are entitled to have the holders of paper executed by the partners in their own names, for partnership purposes, excluded from participation in the partnership funds, because the paper is calculated to mislead in consequence of its not being executed in the firm name, finds no countenance in either of these cases. We have yet to see a case in which it does find countenance.

It is argued that a note signed by all the partners as makers is

the same at law as if it were signed by the firm's name, and that it is for this reason that it is allowed to be proved against the joint effects. We do not understand the cases so. The cases hold that such a note is *primâ facie* the individual note of the makers, provable only against their separate estates, and, before it can be proved against the joint estate, it must be shown to have been made for partnership purposes. Such a note is allowed against the joint estate because it is made for the partnership by the partners acting as such, and is therefore a mode of partnership action. The notes here have intrinsically the same character, and if they cannot share in the joint effects it must be solely because the partners cannot be sued upon them jointly at law. It would seem as if a court of chancery, which, for the purposes of justice, treats a partnership liability, which at law is simply joint, as several also in equity, might likewise, especially if unrestrained by statute, treat a liability incurred by the partners for the partnership, which might be simply several at law, as also joint in equity, if necessary for the purposes of justice. The case of *In re Thomas & Sivyer* seems to go to that extent, as also do the *dicta* of some of the cases. And see *Gauss* v. *Schrader*, 10 Bissell, 289.

We pass to the third class of cases. In *City Bank's Appeal*, 54 Conn. 269, four notes were signed by the two partners constituting the firm, one of them signing as maker and the other as payee and indorser, and discounted by the bank, the proceeds being placed to the credit of the firm, which had a firm name. The firm being afterwards in insolvency, the bank made claim to share in the firm's assets, on the ground that the notes were in fact partnership paper ; and, a jury having found that they were such under instructions to find so, if they were satisfied by a preponderance of the evidence that they were such, and were discounted as such, the credit being given to the firm, the court sustained the finding. It seems to us that the case is in point as authority for the case at bar in at least some of its aspects.

In *Ex parte First National Bank*, 70 Me. 369, the partnership consisted of two partners, who carried on the business without a firm name. They made notes, signing them in their individual names, one as maker and the other as payee and indorser. They got the notes discounted for the partnership, and the proceeds were

used in the partnership business. The bank making the discount did not know that there was any partnership. The partners afterwards became insolvent, and the bank filed proof of its claim, by reason of the notes, against both partnership and individual estates. The judge of·the court of insolvency allowed the claim against the partnership, but disallowed it against the individual estates. On appeal to the Supreme Court, the court in the first instance reversed this decision, allowing the claim against the individual, but disallowing it against the partnership estate, on the ground that the bank was entitled only on the notes according to their form ; but this decision was set aside on exceptions, and the bank was allowed to prove· either against the partnership or individual estates, as it might elect, not against both. The court said : " The bank, it is to be presumed, would have taken notes in a better commercial form had its officers known the fact of partnership, and had they preferred the paper of the firm. Not having an opportunity to make the election then, through misunderstanding, they should not be debarred from the right afterwards."

It is argued that in these words the court declare the ground of their decision ; that the case is, therefore, authority only when the partnership has no name, and when the fact that it exists is unknown to the party making discount, and that for the case at bar it is without pertinency. We are not satisfied of the correctness of this view. Primarily the question for the Maine Supreme Court was, whether the form of the notes was conclusive as to the right of the bank as creditor, and the court decided the question in the negative, giving their reasons. Their language is : " With the partners themselves, the transaction was the same as if the money had been borrowed upon their note in strictly partnership form. The money was borrowed for and applied to partnership purposes. But for failure the partners would have paid the note from the money of the firm. One partner could have no advantage over the other, although one was indorser only. As between themselves, both were makers and both indorsers. Presumably they intended to give a partnership note. They have themselves treated it as a partnership liability. . . . Is the bank entitled, in insolvency, to prove its note, or, what is in substance the same,

its claim for the money given as a consideration for the note, against the partnership estate? We think it is. The borrowed funds are a part of the partnership estate. It is just and equitable that the same estate, proportionately to its sufficiency, should restore such funds to the lender." And, in answer to the objection that by the rule of law oral testimony is not admissible to prove that any person is a party to a bill or note who is not so on its face, the court added: "But equity looks more to the fact than to form, and the rule of distribution incorporated into our insolvent law is one imported from the principles and practice of courts of equity;" and also, "Where the names of both partners are upon the note, both are holden thereon."

The court then, after making another point, namely, that the signing by the partners, one as maker and the other as indorser, might be regarded as one mode of partnership signing, used the words first above quoted. What did the court mean by them? In our opinion they meant simply this: It cannot be said that the bank has already made its election, making it when it discounted the paper, since the fact of partnership was then unknown to it, and therefore it may elect now. As we understand the case, the bank was allowed to elect; not because it was ignorant of the existence of the partnership when it took the paper, but because, being ignorant, it could not be held to have then elected; and the result would have been the same if, for any other reason, it could not have then been held to have elected. The court do not even mention in this connection the fact that the partnership had no firm name.

The case of *Smith* v. *Felton*, 43 N. Y. 419, is not directly in point, and was cited as illustrative of the greater freedom with which technical matters are dealt with in equity than in law. To that point see, also, *Van Reimsdyk* v. *Kane et al.* 1 Gall. 630. The case *In re Warren*, 2 Ware, 320, decided in the United States District Court A. D. 1847, under the bankrupt law then in force, the question being whether certain creditors were entitled as individual or copartnership creditors, is more apposite. There two lawyers who were in partnership engaged in a series of speculations in real estate, sometimes using the firm name and sometimes their individual names. "When they commenced business," says

the court, " they gave their joint notes, signing separately and not in the partnership name ; but more frequently the securities, for the convenience of negotiation, were in form of bills of exchange, *drawn by one and accepted by the other.*"    The court said in effect that generally when a member of a firm makes a note or draws a bill in his own name, though it is known to be on partnership account, the member and not the firm is bound, because the creditor is supposed to prefer his individual liability, but that this rule does not prevail where there is a secret partner, or where one partner has been in the habit of drawing and indorsing bills in his own name for the partnership which have been treated by the other as binding the firm ; and that, in the opinion of the court, the rule ought not to prevail where two partners composing a firm unite in drawing bills or making notes in their several names, if they do so on partnership account.    In that case the holders of the paper executed in the names of the partners wished to prove against their individual estates ; but the court held that in the circumstances the presumption was that credit was given to the partnership, and that the holders must overcome this presumption by evidence before being allowed so to prove.

In the case last cited, the court recognize a doctrine which was also recognized in *Ex parte First National Bank, supra,* namely, that the commercial paper of a partnership may be made by one partner signing in his own name, if he is authorized by his copartners to make it so, or may be made by both concurring in signing in their individual names, even if one sign as maker and the other as indorser, or one as drawer and the other as drawee.    The doctrine is supported by authority.    *Palmer* v. *Stephens,* 1 Denio, 472 ; *South Carolina Bank* v. *Case,* 8 B. & C. 427 ; *Morse* v. *Richmond,* 97 Ill. 303 ; *Bank of Rochester* v. *Monteath,* 1 Denio, 402, 405 ; *Theilen* v. *Hann,* 27 Kans. 778 ; *Wright* v. *Hooker,* 10 N. Y. 51 ; *Sprague* v. *Ainsworth,* 40 Vt. 47 ; *Seekell* v. *Fletcher,* 53 Iowa, 330 ; *Crocker* v. *Colwell,* 46 N. Y. 212.

In the case at bar the evidence is, that the partnership was formed in 1876, and lasted ten years, until the death of the senior partner ; that it consisted of George C. and George W. Elliott, father and son ; that there never were any articles of copartnership ; that the general business was transacted in the name of

George C. Elliott & Son, and also of The Elliott Carriage Depository ; that money for the firm was raised upon notes given in the name of George C. Elliott & Son, indorsed by George C. Elliott, and in the name of George W. Elliott, indorsed by George C. Elliott, two thirds of the money raised in the last three or four years, amounting to between fifty and sixty thousand dollars, being raised on notes given in the latter form, and eight out of the ten notes sued being in that form.    The proceeds of the notes all went to the firm, and were entered directly on its cash book, and not, as in *Emly* v. *Lye*, in account with any person.    The interest on renewals was paid by the firm.    The notes and the renewals were entered on the book of bills payable kept by the firm.    The proceeds were used in the business of the firm, except the comparatively small amounts withdrawn for the partners.    It does not appear that the proceeds of the notes in the one form were treated any differently from the proceeds of the notes in the other. The notes were made in the individual form with the full knowledge and consent of both partners.    The cashier of the Manufacturers National Bank, a holder of one of these notes for $5,000, testified that the original application for the loan was in the name of George C. Elliott & Son, and that when the note was presented he called attention to the fact that it did not correspond with the application, and George W. Elliott represented that that was the way they made paper for the business of the firm, and that, upon this representation, the note was taken and the money advanced. The cashier of the Traders National Bank, a holder of two of these notes for $5,000 each, testified that George C. Elliott & Son had an account with the bank, and that, when the notes were discounted, the proceeds were placed to the credit of the firm ; that the notes were renewed many times, and every time the proceeds of the new note were placed to the credit of the firm, and checked out in the firm name for the payment of the old note, and that the discounts were made for the firm on the notes regarded as firm paper.    A partner of the firm of Billings Brothers, holders of one of the notes, testified that he received it in exchange for notes of his firm, but made to the firm of George C. Elliott & Son, on application to George C. Elliott, who represented that the firm of Elliott & Son wanted more money, and that the notes lent should be taken care of by said firm.

We think it is very clear on this evidence that the notes were made and indorsed by the two partners as the paper of the firm. It seems to us that the making and indorsing of them were just as much partnership acts, in which the two partners united, as the subsequent use of them for the purpose of raising money for the firm was the partnership act of George W. Elliott, and, this being so, it seems to us that the notes so made and used were partnership paper on which the two partners were jointly liable as partners. In legal effect, both were makers and both indorsers, because they both acted as partners, not as individuals, when they affixed their signatures. Of course, in this view the holders are all entitled to prove as partnership creditors against the partnership effects.

We also think that, looking at the matter in another view, the Manufacturers National Bank, the Traders National Bank, and Billings Brothers, are clearly entitled to prove as partnership creditors within the authority of *Maffet & Rhoads* v. *Leuckel*, of *In City Bank's Appeal*, and of *In re Warren, supra*. In regard to the other banks, the evidence does not show whether, when they made their advances, their understanding was that they were lending to the firm, or to the partner as an individual ; but supposing that the latter was their understanding, since *primâ facie* the notes were individual, we think there is still authority on which, independently of the proof that the notes were technically partnership, they are entitled to prove as partnership creditors if they so elect, namely, the cases of *Denton* v. *Rodie* and *Tucker* v. *Peaslee*, and the cases of *Ex parte First National Bank* and *In re Warren, supra ;* for, if the banks did not know when they made the advances that they were being procured for the partnership, they cannot be held to have then elected the individual partners rather than the partnership as their debtors. And see Story on Partnership, § 140.

Our renewed examination of the subject has deepened our impression that there is a great want of definiteness of doctrine in the decisions upon it, but it has not altered our opinion. It seems to have been a mere chance that all the notes used to raise money for the partnership were not notes signed by one partner and indorsed by the other ; and if they had all happened to be so, we

do not think that any court could have hesitated to regard them as partnership in fact, though individual in form.

We do not think the banks should be precluded from proving against the partnership estate upon the ground that they have made their election by submitting proofs against the separate estate of the deceased partner, since they did so, supposing they could prove against both. The proofs against the separate estate should be withdrawn, that estate being insolvent. *Ex parte First National Bank*, 70 Me. 369, 380 ; *Ex parte Adamson*, L. R. 8 Ch. Div. 816 ; *Ex parte Law*, 3 Deac. 541 ; *Ex parte Bolton*, 2 Rose, 390.      *Former decision affirmed.  Decree accordingly.*